# EXHIBIT 3

# EXHIBIT 3

## DECLARATION OF LOUIS DENE, ESQUIRE
## PURSUANT TO 28 U.S.C. § 1746

I, Louis Dene, do make oath and swear:

1. I am an attorney licensed by the Commonwealth of Virginia.

2. In February 2004 I was appointed to represent Carlos Caro in Western District of Virginia Case Number 2:03cr10115. Mr. Caro was charged with Conspiracy to Commit Murder, Assault with Intent to Commit Murder and Possession of a Prohibited Object.

3. Prior to my appointment in February 2004, Mr. Caro had been implicated in the death of an inmate at USP Lee in December 2003. I was aware of the homicide, but it was separate from the case in which I represented him.

4. It was my understanding that the Government intended to proceed with a death penalty case against Mr. Caro at the conclusion of the 2:03cr10115 case.

5. As part of my representation I worked to obtain a plea agreement with the United States Attorney's Office whereby Mr. Caro would plead guilty to the most serious offense of Conspiracy to Commit Murder and the Government would allow his co-defendant, Juan Carlos Moreno-Marquez to plead to the lesser offense of possessing a prohibited object. The plea agreement, which I understood was proposed by Mr. Moreno-Marquez, provided no real benefit to Mr. Caro; however it did benefit Mr. Moreno-Marquez.

6. I advised Mr. Caro that the plea agreement would mean that he would receive a very long sentence. Mr. Caro stated that "he wasn't going anywhere," so the long sentence did not matter to him. I did not advise him of the implications that the plea agreement would have on the prison killing case. I did not advise Mr. Caro that the Conspiracy to Commit

Murder conviction would likely be used against him in a later capital case and that he should not sign the plea agreement.

7. I was aware of Mr. Caro's limited education. I know that Mr. Caro had not completed high school and that he had no ability to understand legal proceedings without the benefit of counsel.

8. I regularly advised Mr. Caro and he followed my advice. Mr. Caro trusted me. Mr. Caro was not afraid of going to trial and if I recommended going to trial he would have done so.

9. I was contacted by the trial attorneys who represented Mr. Caro on the capital charges. However, I was not asked about the reasons for the plea agreement, nor was I asked about my recommendations to Mr. Caro.

10. After Stephen Kalista was appointed, he visited my office to copy my file. He copied a portion of my file, but not all of my file.

I declare under penalty for perjury that the foregoing is true and correct.

Executed on __11-9-12__.

_Louis Dene_
Louis Dene

# EXHIBIT 4

# EXHIBIT 4

## DECLARATION OF LARRY A. HAMMOND

I, Larry A. Hammond, declare as follows:

1.     I am a member of the law firm of Osborn Maledon, P.A.  I am a member of the Bars of the States of Arizona (1975) and California (1971; inactive).  I am a graduate of the University of Texas School of Law (1970).

2.     I was asked to review materials in connection with the post-conviction proceeding in *United States v. Carlos Caro*, Case No.06-cr-00001-JPJ (W.D.VA.), and provide this Declaration.

3.     I was retained to serve as an expert on issues relating to the effective assistance of trial counsel in Mr. Caro's case.  I am being compensated at the rate of $300.00 per hour.  My current hourly rate for criminal defense-related work at Osborn Maledon is $550 per hour.  My background is briefly summarized below.  A copy of my CV is attached.

4.     After graduation, I served as a law clerk to the Honorable Carl McGowan on the United States Court of Appeals for the D.C. Circuit in 1970-71.  I then served as the last law clerk for Justice Hugo L. Black and the first law clerk for Justice Lewis F. Powell in 1971 through 1973.  In 1973 and 1974, I served as an Assistant Watergate Special Prosecutor.  In 1974, I began practicing in Arizona at the private law firm which was the predecessor of Osborn Maledon, the firm with which I am now affiliated.

5.     During the Administration of President Jimmy Carter, I served as First Deputy Assistant Attorney General in the Office of Legal Counsel (OLC) at the Department of Justice (1977-1980).

4633616v1

6. Both as a Supreme Court law clerk and as a Deputy at OLC, I undertook responsibilities with respect to death penalty-related matters.

7. In 1981, I rejoined my law firm, which is now known as Osborn Maledon in Phoenix, Arizona. From 1981 to the present, I have been engaged in the practice of law primarily on the criminal defense side. Throughout that time, my law firm has been engaged in death penalty work, including direct representation and policy-related work in that field.

8. I have been a practicing lawyer for 42 years. I have been engaged in civil litigation and criminal defense work continuously for the last 31 years. I am a member of the American College of Trial Lawyers.

9. From 1981 to the present, I have spent at least some portion of my time every year on capital cases. The law firm of Osborn Maledon (and its predecessor firm) and I have been involved in capital litigation at every stage, including trial, sentencing, direct appeal, post-conviction review, federal habeas corpus, and clemency. I am one of the founders of this law firm and have been its senior criminal defense lawyer since its inception. I have been personally involved in every capital case in which lawyers in this firm have been engaged.

10. I have tried to verdict two Arizona capital cases and recently concluded a six-month involvement in a case in Yavapai County, Arizona, that began as a capital case but in which the prosecution elected to remove the death penalty as a possible penalty at the end of a one-month jury selection *voir dire*.

4633616v1

11.     I have also served as trial court counsel in eight federal death penalty cases, two in New Mexico, one in Nevada, four in the District of Arizona, and one in the District of Southern California.  In each case, I was appointed as lead counsel pursuant to 18 U.S.C. § 3005's requirement that each defendant be assigned two attorneys, one of whom is deemed to be "learned in the law applicable to capital cases."

12.     Within the last 15 years, Osborn Maledon has consulted frequently with indigent defense offices in Arizona and in the mid-1990s I served as co-counsel in connection with two capital cases assigned to the Office of the Maricopa County Legal Defender (OLD), *State v. Pape* and *State v. Pilipow*.  Both cases required extensive development of mitigation and mental condition information.

13.     Since 1998, I have served as lead counsel in the federal capital habeas corpus proceeding arising from an Arizona capital conviction (*Atwood v. Stewart,* Case No. CIV96-116 TUC JCC).

14.     In approximately 1989, I participated in the founding of the Arizona Capital Representation Project, and I have served as a Board member and/or officer of that organization since its inception.  The Project has been involved, at one stage or another, in assisting virtually every member of Arizona's death row population.  Congress defunded all capital resource centers in 1996, but since that time the Project's activities have continued and the Project remains a resource in all phases of capital litigation – particularly at the post-conviction stages.

15.     In approximately 1994, I was asked to serve as the Chair of the Arizona State Bar's Indigent Defense Task Force (IDTF), and I have continued in that position

4633616v1

since that time. The IDTF has been engaged in the development of rules promulgated by the Arizona Supreme Court dealing with capital defense funding and indigent defense funding generally. The IDTF has also been involved in developing and testifying in support of, or in opposition to, legislative proposals dealing with the funding of capital defense in Arizona. The Task Force participated in the development of legislation creating the standards for the appointment of counsel and for the funding of representation at the state post-conviction stage in capital cases. Among the most important undertakings of this Task Force has been the successful effort to secure an amendment to Rule 6.8 of the Arizona Rules of Criminal Procedure to require lawyers in capital cases to be guided by the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.

16. For several years I also served on the Arizona Supreme Court's Committee for the Appointment of Counsel to represent death row inmates at the State post-conviction relief stage. I participated in the drafting, review and ultimate establishment of the rules governing the appointment of death penalty counsel under A.R.S. §13-4041 and Rule 6.8 of the Arizona Rules of Criminal Procedure.

17. I have co-authored several articles that have appeared in the *Arizona Attorney Magazine* relating to the funding of capital defense, and I have spoken and participated in numerous seminars and programs on this subject. As an adjunct member of the ASU Law School faculty, I team-taught the Death Penalty course in the spring of 2002. During the 2003-04 and 2006-07 school years, I team-taught a 4-hour credit seminar at ASU on the causes of wrongful convictions in Arizona and nationally.

4

4633616v1

Included in the curriculum was the study of ineffective assistance of defense counsel. In the fall of 2008, I taught a course entitled "Criminal Justice Failures and Reforms" at Elon University School of Law in Greensboro, North Carolina. A significant element of this course was the history of the law and practical realities of systems of indigent defense in capital cases.

18.     For the last 14 years, I have served as the Chair of The Justice Project of Arizona Attorneys for Criminal Justice, and in that capacity I have been involved in the evaluation of hundreds of cases alleging ineffective assistance of counsel at trial and sentencing in non-capital cases. The U.S. Supreme Court recently ruled in favor of one of the Justice Project's federal habeas corpus cases, *Martinez v. Ryan,* 132 S.Ct. 1309 (2012), in which the Court held that the ineffective assistance of counsel at the post-conviction stage could constitute good cause to excuse a procedural default.

19.     I testified in October 2002, as an expert witness on ineffective assistance of counsel in a post-conviction relief proceeding in *Lacy v. Arizona,* Case No. CR 1995-000713. In that case, the Maricopa County Superior Court reversed a homicide and assault conviction based in part on ineffective assistance of defense counsel. I have also testified and served as an expert in the capital post-conviction proceedings in *Arizona v. Kayer,* CR 1994-0694, in the Superior Court of Yavapai County, and as an expert in the post-conviction proceeding in *Arizona v. Murdaugh,* Case No. CR 1995-006472, in the Superior Court of Maricopa County. In December 2010, I testified as an expert witness in a post-conviction proceeding in Connecticut State Court, in *State v. Wargo,* 53 Conn.App. 747, 731 A.2d 768 (1999).

5

4633616v1

20.    At present, I am serving as a death penalty defense standard of care expert in four post-conviction cases; three in Arizona and one in Colorado.

21.    Most recently, I testified as a standard of care expert in the case of *United States v. Brandon Basham*, No. 02-cr-992-JFA (D.S.C.).

22.    My opinions are based in significant part on my experiences as "learned counsel" in federal death penalty cases. In addition to my direct involvement in federal death penalty cases, I have also conferred on numerous occasions with Federal Capital Defense Resource Counsel about the duties and responsibilities of capital trial counsel. In particular, I have conferred with federal defense counsel about the Department of Justice's process for the Government's consideration of whether to seek the death penalty.

23.    In the course of the federal death cases to which I have been appointed, and on other matters involving capital litigation, I have frequently been involved in the planning, development, and presentation of mitigating evidence, and the pre-trial investigation necessary in the course of developing mitigating evidence and preparing to address and respond to the Government's anticipated aggravating factors.

24.    Counsel for Mr. Caro have asked me to address questions with respect to the standard of care for attorneys representing a defendant in a federal death penalty case. I have undertaken a preliminary review of materials related to the representation of Mr. Caro at the pretrial, trial, and penalty phases, as well as direct appeal. Based on that review as informed by my experience and training summarized above, I offer the following opinions and observations.

25.   From the outset of the representation of a person charged with a federal death-eligible offense as was the case with Mr. Caro here, defense counsel must commence preparing for all phases of the case, including most importantly both the guilt/innocence and the penalty phases. Counsel must recognize that capital trials require a defense that is cognizant of the reality that the defendant is likely to be found guilty by the jury and that the same jury will then weigh aggravating and mitigating evidence. In this case, there was little doubt that Mr. Caro killed Mr. Sandoval. From opening statements through the conclusion of the penalty phases of the trial, the defense conceded Mr. Caro's responsibility for the killing of his cellmate.

26.   What was in doubt from the outset of the representation of Mr. Caro was both the level of his culpability for the death of Mr. Sandoval and whether that act warranted the penalty of death. The defense, from the outset, had to focus on attempting to save the client's life.

27.   Inescapably, much of the foundation for the presentation of both aggravating and mitigating evidence will have been laid during the presentation of evidence at the guilt/innocence stage. Given this reality, several key principles should have dominated the defense effort from the outset: (1) defense themes must be developed on an ongoing basis; (2) those themes must permeate all aspects of the defense work in the case; and (3) the investigation essential to the development of defense themes must commence immediately and inevitably will require time and resources.

28.   The simultaneous investigation of facts underlying the charged offense and the social history and mental health issues is always a challenging task for defense

7

4633616v1

counsel and their team members. It is inconceivable that an appropriate investigation into these issues could be accomplished in as little as six months. Many jurisdictions, including Arizona, routinely contemplate that pretrial preparation will require two years and in some cases more. There are many reasons why more time is required in capital cases than might be necessary in noncapital cases, but whatever the specific needs of any cases, it is virtually certain that competent investigation and preparation cannot be realized in a matter of months. As the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases underscored in 2003, a thorough investigation of the defendant's life history and mental development is both essential and time-consuming. In recognition of the critical role of mitigation development, the ABA published Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty cases in 2008. These Guidelines are a compilation of the standards and practices that guided death penalty defense counsel at the time of the appointment of the defense team in Mr. Caro's case. Taken together, and underscored by now hundreds of reported cases, the central importance of thorough mental health development is no longer doubted.

29.   The standards of performance for defense counsel in death penalty cases are national standards. These standards are rooted in federal constitutional guarantees. Federal death penalty cases are most certainly subject to a single set of responsibilities for defense counsel. There is no basis for concluding that a defendant prosecuted in the Western District of Virginia is entitled to less time to prepare, less court-authorized financial assistance in order to prepare, or less effective defense counsel.

8

30.    The defense team in this case presented no mental health/mental defect testimony at either the guilt/innocence phase or at the penalty phase. The defense did secure the appointment of an expert to conduct a neuropsychological evaluation, but ultimately presented no mental health testimony. While this investigation may well properly involve a neuropsychological evaluation, there is no substitute for a thorough mental health evaluation, which may require—as it did here—a combination of experts and consultants.

31.    Since virtually every federal death penalty case requires court-authorized funding, an important part of the obligations of defense counsel is to begin from the outset to obtain adequate resources. This process often requires helping the court to understand why an extensive background investigation of the client's life history and mental state history is necessary. This is one of the reasons why it is indisputably true that case preparation in federal death penalty cases cannot be accomplished in six months or a year. Many federal courts are unfamiliar with the unique resource requirements of death penalty cases. The need for frequent, on the record, ex parte sealed proceedings may not be entirely evident to the Court. In my experience, federal judges are usually generally familiar with typical Criminal Justice Act (CJA) funding procedures, but these typical procedures are not predictive of the needs in capital cases. This is not intended as in any way a criticism of federal judges. Rather, it is a statement of an important element of the responsibility of defense counsel. Just as defense counsel needs specialized expertise, the court and those responsible for funding capital defense need to become educated on the requirements of capital defense.

4633616v1

32.    The representation of Mr. Caro may have presented challenges in terms of securing adequate time and resources. The crime charged involved the presentation of only a few witnesses. It may well have been the case that all parties—the prosecution, defense, and the court—began by assuming that the case could be brought to trial in a matter of months. It was the duty of defense counsel, however, to work from the outset to assure that time was available, and resources secured, to undertake a thorough life history for Mr. Caro and to investigate fully his social and mental history. The need for this full development is particularly important in a case in which it is apparent from the outset that the defendant grew up in a community and society where drugs and violence were a part of everyday life.

33.    Prison killing cases present special concerns. First, as was the case here, the Government's case is likely to be based on the testimony of incarcerated informants. Jailhouse or prison "snitch" testimony requires thorough investigation. It is now well established (thanks in significant part to the examination of DNA-based exonerations) that false and unreliable inmate testimony is one of the key causes of wrongful convictions. Secondly, as was also the case here, there are often other inmate witnesses who the Government does not intend to call as witnesses, but who have relevant information that may contradict an informant's testimony. Thirdly, it is important for defense counsel to thoroughly investigate whether any prison-related homicide is most properly understood as deserving of an instruction on lesser included offenses and/or on self-defense. Many prison homicide cases—and this case is one good example—might well not be genuinely regarded as premeditated first-degree murders. Defense counsel

10

4633616v1

must carefully consider whether the jury could come to appreciate that an inmate-on-inmate homicide involves unique mental health and other severe stresses warranting a finding of second-degree homicide, manslaughter, or in some cases an acquittal based on self-defense.

34.    This case presented a classic case of the difficulties that can be anticipated when the Government chooses to rely on inmate testimony to support an allegation of premeditated murder. The only "eye-witness" offered in the case was Mr. Bullock, an inmate in the Special Housing Unit (SHU) who resided across the hallway from the cell in which Mr. Caro and Mr. Sandoval were housed. Given that premeditation was the central issue at trial, Mr. Bullock's various descriptions of what he observed became key. The necessary investigation and preparation for trial should have focused on the development of evidence that might undermine this inmate's testimony. It is evident that Mr. Bullock had a cellmate. What he may have observed and what Mr. Bullock may have told him about what Mr. Bullock observed would have been critically important.

35.    Prison killing cases charged as capital crimes almost inevitably will be based on a prosecution claim of future dangerousness. Defense counsel must know this and plan to respond thoroughly to this non-statutory aggravating circumstance. Competent responses to this aggravating factor require expert assistance on prison management. The federal Bureau of Prisons (BOP) is equipped to eliminate the material risk of future assaults by inmates who pose the greatest internal security risks. A thorough understanding of this topic is necessary in approaching the trial and penalty phases. While the defense team was certainly aware of the importance of this

11

4633616v1

aggravating factor, it appears that they may have failed to appreciate the extent to which jurors are affected by concerns about the ability of a prisoner to inflict injury in the future.

36.    Similarly, gang-related capital cases also present predictable areas requiring defense preparation. Very typically the Government can be expected to argue that, unless executed, the defendant will continue to communicate with and instruct other gang members to commit acts of violence both inside and outside the prison. BOP also has in place systems and procedures to deal with security threat groups (prison gangs). Defense counsel should anticipate that it will be important to the jury to know that these systems and procedures can reduce if not eliminate the risk of future dangerousness. The defense effort in this regard—relying on Messrs. Aiken and Cunningham to rebut the testimony of the Government's expert, Mr. Hershberger—was deficient. (My opinions with respect particularly to prison homicide issues are informed by my experience as court-appointed counsel for inmates seeking protective custody in the Arizona prison system and by my direct involvement as plaintiffs' counsel in jail conditions cases. My opinions in this respect are also informed by my representation of defendants in federal death penalty cases in Arizona, New Mexico and California.)

37.    Another important part of defense counsel's obligation in capital cases is to investigate and to challenge where appropriate prior convictions that may be used by the Government as aggravating factors. This is an important obligation irrespective of whether the defendant was convicted after a trial or entered a plea of guilty in prior cases. In this case, the conviction of Mr. Caro in connection with the stabbing death of inmate

12

4633616v1

Benavidez became an important element of the Government's case in support of aggravation. Counsel had a duty to investigate and challenge that underlying conviction.

38.    I appreciate the difficulties that defense counsel in this case encountered, but I respectfully conclude that their performance fell below the standard of care for death penalty defense in the ways I have identified above. I also have the following additional concerns.

### The Department of Justice Death Penalty Certification Process

39.    It is my opinion that reasonably competent counsel in Mr. Caro's case should have aggressively pursued the opportunity afforded by the Department of Justice's Death Penalty Certification process to seek a determination that his case was not one in which the death penalty should have been pursued. My opinions on this question are informed by my participation in the process on numerous occasions and having consulted with other capital defense counsel who have been involved in making presentations to the Department of Justice's Death Penalty Review Committee.

40.    This phase of the capital defense is particularly important in cases in which the Department of Justice is necessarily considering whether this prison homicide should be treated differently from other prison-related homicides. A greater understanding of Mr. Caro's mitigating evidence, coupled with a greater appreciation of the prison environmental factors should have been presented so that the Attorney General might better evaluate both the aggravating and mitigating circumstances. Again, more time to prepare and to work with the development of the factual investigation and the penalty phase facts would have been valuable. It is apparent from a review of the documents

13

4633616v1

from early 2005 that the defense team had only begun to develop its case when they went to Main Justice for the Committee meeting. The fact investigator appears to have been engaged only a very few months before the Main Justice meeting and the mitigation specialist had not begun to actively develop Mr. Caro's personal history.

41. I understand the argument sometimes made that defense counsel does not want to "give away" defense strategy and themes, but that argument needs carefully to be weighed against the importance of the opportunity to achieve a "no death" decision. As with other effective presentations in capital cases, the importance of a written as well as an oral presentation should not be understated. Especially where the Death Penalty Review Committee may be composed of members some of whom will be in attendance at the oral presentation and some of whom may not, the written presentation may be only way to assure that decision makers see defense counsel's arguments. In this case, it does appear that some of the Department of Justice participants were not physically present but appeared instead by videoconference. It also appears from a review of the relevant correspondence that the defense team was aware of this possibility. Effective presentation always suffers when important communications are handled by a combination of in-room and videoconference connections, but the loss in communication effectiveness might have been ameliorated by a written presentation.

42. It is also important for defense counsel to keep in mind that the Attorney General is the ultimate decider, and particularly in cases like this one involving important policy questions (the BOP's ability to distinguish among homicide cases occurring in its institutions, etc.), the personal consideration by the Attorney General should be

14

4633616v1

anticipated. The views of counsel for Mr. Caro at this stage should not have been filtered through the Committee members. There have been dozens of homicides that have occurred in BOP. Only a very few have resulted in a decision by the Attorney General to seek the death penalty. The Justice Department claims to have a system for deciding which cases should precede as death penalty cases, *i.e.*, that the Government can differentiate whom among these defendants should be candidates for death. The defense team did develop a greater understanding of these issues as the case progressed, but at the time of the Committee presentation the defense team had not yet secured the assistance of experts and consultants to aid them in developing a theme for life.

### Advising the Client About the Consequences of a Guilty Plea

43. It is my opinion that defense counsel representing Mr. Caro in the Benavidez prosecution fell below the standard of care in failing to properly advise Mr. Caro of the consequences of his plea in that matter.

44. One of the aggravating circumstances alleged and established by the Government in the Sandoval case involved Mr. Caro's plea of guilty to murder in another prison killing case. It is evident that Mr. Caro's plea in that case would be used by the Government as part of its aggravation case, yet it also appears that capital defense counsel took no steps to attack that plea. Reasonably competent capital counsel must examine all criminal convictions that may be used to enhance the client's sentence— especially any conviction that may be used to support an aggravating circumstance as was the case here. A proper examination of the circumstances surrounding Mr. Caro's plea in that case would have revealed that he was not advised of the important

15

consequence of his plea, *i.e.,* that it could be used in the Sandoval case as an important underpinning supporting the Government's successful effort to seek the death penalty.

45.     While the United State Supreme Court has focused greater attention on the critical importance of counsel in connection with guilty pleas, competent counsel have long known and emphasized the duty fully to advise a client of all of the direct and collateral consequences of a plea. Mr. Caro was not advised by counsel in the Benavidez matter that pleading to conspiracy to commit first degree murder would have been used to support an aggravating factor in the Sandoval penalty phase.

### Development of Mitigating Evidence

46.     It is my opinion that defense counsel for Mr. Caro fell below the standard of care in failing fully to investigate and develop issues with respect to mental health issues. As noted above in this Declaration, the development of mitigating evidence with respect to a capital defendant's mental history is a critical component of the capital defense function. In this case, it appears that defense counsel first secured the appointment of an expert consultant to perform a neuropsychological evaluation. It further appears that defense counsel's plan was to defer considering other mental state experts until the neuropsychological evaluation was completed. This approach falls far short of the standard of care. All of the relevant case law and secondary literature about the development of mitigation emphasizes that defense counsel must undertake a comprehensive examination of mental health issues.

16

4633616v1

47.    To whatever extent the failure to develop Mr. Caro's complete history was the result insufficient time, defense counsel should have been advocating the need for great time and greater resources. There is no substitute for a thorough life history as a foundation for expert testimony. Developing that history does take time and it takes money, but there is no reason to believe that both the time and the resources would not have been available.

48.    Defense counsel knew that Mr. Caro had brain damage. They knew that he had a traumatic childhood. Counsel nonetheless failed to secure the necessary experts to present this information to the jury. The standard of care for defense counsel requires the full development and appreciation of these issues. Had defense counsel developed the information there is no reason why they would have determined not to present it to the jury in this case.

### Failure to Conduct Appropriate Investigation

49.    It is also my opinion, as noted above, that defense counsel fell below the standard of care in failing to investigate information with respect to the testimony offered by the Government from an inmate housed directly across from Mr. Caro's cell with respect to the credibility of the incriminating testimony offered by that witness. I wish to emphasize this concern as it appears to have permeated this case from beginning to end. Exactly how the death of Mr. Sandoval occurred turned out to be the difference between a life or death sentence for Mr. Caro. The image of the planned and violently executed strangulation dominated the Government's closing arguments. The Government was able

17

4633616v1

to weave together the circumstantial evidence and Mr. Caro's incriminating statements with Mr. Bullock's account to paint a picture that could only have propelled the jury to find as it did - that this homicide deserved the death penalty.

50.    The record in this case reveals that the chief cooperating witness for the Government may have had a motive to provide inaccurate and misleading testimony. It is also apparent that this inmate had a cellmate. Grand jury testimony makes this evident, although presumably defense counsel would have known or expected that other inmates in the Special Housing Unit at the USP Lee would have had cellmates. For the reasons described above, a thorough investigation should have been undertaken prior to trial.

### Failure to Seek removal of Juror

51.    During the trial, the Court observed that one juror appeared to be sleeping during testimony. After conferring with counsel the Court decided not to remove the juror. Attention to all testimony is central to the role of jurors as fact-finders. Any juror who cannot maintain full attention should have been removed. Here, there were four alternates. There was no material risk that removing the juror would occasion a mistrial. Defense counsel should have moved and strongly advocated for the dismissal of that juror. (My opinion on this topic is informed by my participation in several lengthy trials in which sleeping or noticeably inattentive juror behavior occurred. The defense team in these cases debated the tactical pros and cons of seeking removal; we conferred with other defense counsel who had encountered similar situations; and we ultimately concluded that the defendant's entitlement to a unanimous jury required that all jurors were engaged in the hard job of receiving testimony.)

18

4633616v1

## Appellate Counsel's Duties

52.    Appellate and post-conviction defense counsel in death penalty cases have special duties not always encountered by defense counsel in noncapital cases. Most important among those duties is the duty to advocate for reconsideration and change in the law affecting the constitutionality of the death penalty. No other field of criminal defense representation has been so marked by dynamic change. The duty to advocate for reversal of the death sentence is especially important when the case is on direct appeal. The jurisprudence of the law of retroactivity has often distinguished between cases that have become "final judgments" and those that have not. New rulings may benefit those convicted defendants whose cases were on direct appeal—or who raised the same issue underlying that ruling on direct appeal.

53.    In this case, appellate counsel failed to allege that the jury was improperly instructed on the standard for weighing aggravation against mitigation. A good faith basis certainly existed in this case to claim that the jurors should have been instructed that aggravation must outweigh mitigation beyond a reasonable doubt. The jury in this case found mitigating circumstances, and they found them unanimously. Yet, the jury was never told to weigh those mitigators against the aggravators—especially future dangerousness—by any particular standard of proof. Had they been so instructed, given the relative weakness of the non-statutory aggravators, it is reasonable to conclude that the jury would not have found that this defendant deserved a sentence of death.

54.    Had the defense undertaken and presented a full mitigation case as contemplated by the ABA Guidelines, there could be little doubt that the jury would have

19

4633616v1

found it difficult to conclude that the Government's aggravating evidence outweighed that mitigation beyond a reasonable doubt. (My opinions on this topic are informed by my experience as part of the post-conviction team that ultimately succeeded in securing the reversal of the death sentence for Timothy Ring in *Ring v. Arizona,* 536 U.S. 584 (2002). The Court's decision in that case directly overruled its own precedent regarding the role of the jury as fact-finder—a decision that was only 10 years old. My opinions are also based on the increasing frequency in the numbers of cases in which Justices of the United States Supreme Court have come over time to change their views on the application of the Eighth Amendment. Justices Blackmun, Powell and Stevens are three prominent examples of the potential that opinions on the constitutionality of the death penalty both on its face and as applied are subject to change.)

### Concluding Observation

55.      My expectation based on my experience in providing standard of care opinions in other cases is that I should form additional opinions that will be informed by a consideration of the Government's Response to Mr. Caro's Petition and a further review of Declarations that may be presented by either party and by a further review of the materials in the file in this case.

DATED this 8th day of January, 2013.

Larry A. Hammond

20

4633616v1