United States v. Carlos David Caro
Case No. 1:06-cr-00001-JPJ

Defense Exhibit List

Ex. 3       Declaration of Louis Dene, 11/09/2012

Ex. 4       Declaration of Larry A. Hammond, 01/08/2013

Ex. 5       Declaration of Stephen J. Kalista, 12/29/2012

Ex. 8       Declaration of Donna M. Schwartz-Watts, M.D., 01/07/2013

Ex. 10      Neuropsychological Examination of Carlos Caro by Malcolm Spica, June
            2006

Ex. 61      Carlos Caro Academic Records

Ex. 62      Declaration of Susan Richardson, 02/20/2013

# EXHIBIT 3

# EXHIBIT 3

DECLARATION OF LOUIS DENE, ESQUIRE
PURSUANT TO 28 U.S.C. § 1746

I, Louis Dene, do make oath and swear:

1. I am an attorney licensed by the Commonwealth of Virginia.

2. In February 2004 I was appointed to represent Carlos Caro in Western District of Virginia Case Number 2:03cr10115. Mr. Caro was charged with Conspiracy to Commit Murder, Assault with Intent to Commit Murder and Possession of a Prohibited Object.

3. Prior to my appointment in February 2004, Mr. Caro had been implicated in the death of an inmate at USP Lee in December 2003. I was aware of the homicide, but it was separate from the case in which I represented him.

4. It was my understanding that the Government intended to proceed with a death penalty case against Mr. Caro at the conclusion of the 2:03cr10115 case.

5. As part of my representation I worked to obtain a plea agreement with the United States Attorney's Office whereby Mr. Caro would plead guilty to the most serious offense of Conspiracy to Commit Murder and the Government would allow his co-defendant, Juan Carlos Moreno-Marquez to plead to the lesser offense of possessing a prohibited object. The plea agreement, which I understood was proposed by Mr. Moreno-Marquez, provided no real benefit to Mr. Caro; however it did benefit Mr. Moreno-Marquez.

6. I advised Mr. Caro that the plea agreement would mean that he would receive a very long sentence. Mr. Caro stated that "he wasn't going anywhere," so the long sentence did not matter to him. I did not advise him of the implications that the plea agreement would have on the prison killing case. I did not advise Mr. Caro that the Conspiracy to Commit

1

Murder conviction would likely be used against him in a later capital case and that he should not sign the plea agreement.

7.  I was aware of Mr. Caro's limited education. I know that Mr. Caro had not completed high school and that he had no ability to understand legal proceedings without the benefit of counsel.

8.  I regularly advised Mr. Caro and he followed my advice.  Mr. Caro trusted me.  Mr. Caro was not afraid of going to trial and if I recommended going to trial he would have done so.

9.  I was contacted by the trial attorneys who represented Mr. Caro on the capital charges. However, I was not asked about the reasons for the plea agreement, nor was I asked about my recommendations to Mr. Caro.

10. After Stephen Kalista was appointed, he visited my office to copy my file.  He copied a portion of my file, but not all of my file.

I declare under penalty for perjury that the foregoing is true and correct.


Executed on _11-9-12_ .

Louis Dene

2

# EXHIBIT 4

# EXHIBIT 4

## DECLARATION OF LARRY A. HAMMOND

I, Larry A. Hammond, declare as follows:

1.     I am a member of the law firm of Osborn Maledon, P.A. I am a member of the Bars of the States of Arizona (1975) and California (1971; inactive). I am a graduate of the University of Texas School of Law (1970).

2.     I was asked to review materials in connection with the post-conviction proceeding in *United States v. Carlos Caro*, Case No.06-cr-00001-JPJ (W.D.VA.), and provide this Declaration.

3.     I was retained to serve as an expert on issues relating to the effective assistance of trial counsel in Mr. Caro's case. I am being compensated at the rate of $300.00 per hour. My current hourly rate for criminal defense-related work at Osborn Maledon is $550 per hour. My background is briefly summarized below. A copy of my CV is attached.

4.     After graduation, I served as a law clerk to the Honorable Carl McGowan on the United States Court of Appeals for the D.C. Circuit in 1970-71. I then served as the last law clerk for Justice Hugo L. Black and the first law clerk for Justice Lewis F. Powell in 1971 through 1973. In 1973 and 1974, I served as an Assistant Watergate Special Prosecutor. In 1974, I began practicing in Arizona at the private law firm which was the predecessor of Osborn Maledon, the firm with which I am now affiliated.

5.     During the Administration of President Jimmy Carter, I served as First Deputy Assistant Attorney General in the Office of Legal Counsel (OLC) at the Department of Justice (1977-1980).

1

6.    Both as a Supreme Court law clerk and as a Deputy at OLC, I undertook responsibilities with respect to death penalty-related matters.

7.    In 1981, I rejoined my law firm, which is now known as Osborn Maledon in Phoenix, Arizona.  From 1981 to the present, I have been engaged in the practice of law primarily on the criminal defense side.  Throughout that time, my law firm has been engaged in death penalty work, including direct representation and policy-related work in that field.

8.    I have been a practicing lawyer for 42 years.  I have been engaged in civil litigation and criminal defense work continuously for the last 31 years.  I am a member of the American College of Trial Lawyers.

9.    From 1981 to the present, I have spent at least some portion of my time every year on capital cases.  The law firm of Osborn Maledon (and its predecessor firm) and I have been involved in capital litigation at every stage, including trial, sentencing, direct appeal, post-conviction review, federal habeas corpus, and clemency. I am one of the founders of this law firm and have been its senior criminal defense lawyer since its inception.  I have been personally involved in every capital case in which lawyers in this firm have been engaged.

10.    I have tried to verdict two Arizona capital cases and recently concluded a six-month involvement in a case in Yavapai County, Arizona, that began as a capital case but in which the prosecution elected to remove the death penalty as a possible penalty at the end of a one-month jury selection *voir dire*.

2

4633616v1

11.    I have also served as trial court counsel in eight federal death penalty cases, two in New Mexico, one in Nevada, four in the District of Arizona, and one in the District of Southern California.  In each case, I was appointed as lead counsel pursuant to 18 U.S.C. § 3005's requirement that each defendant be assigned two attorneys, one of whom is deemed to be "learned in the law applicable to capital cases."

12.    Within the last 15 years, Osborn Maledon has consulted frequently with indigent defense offices in Arizona and in the mid-1990s I served as co-counsel in connection with two capital cases assigned to the Office of the Maricopa County Legal Defender (OLD), *State v. Pape* and *State v. Pilipow*.  Both cases required extensive development of mitigation and mental condition information.

13.    Since 1998, I have served as lead counsel in the federal capital habeas corpus proceeding arising from an Arizona capital conviction (*Atwood v. Stewart*, Case No. CIV96-116 TUC JCC).

14.    In approximately 1989, I participated in the founding of the Arizona Capital Representation Project, and I have served as a Board member and/or officer of that organization since its inception.  The Project has been involved, at one stage or another, in assisting virtually every member of Arizona's death row population.  Congress defunded all capital resource centers in 1996, but since that time the Project's activities have continued and the Project remains a resource in all phases of capital litigation – particularly at the post-conviction stages.

15.    In approximately 1994, I was asked to serve as the Chair of the Arizona State Bar's Indigent Defense Task Force (IDTF), and I have continued in that position

3

4633616v1

since that time. The IDTF has been engaged in the development of rules promulgated by the Arizona Supreme Court dealing with capital defense funding and indigent defense funding generally. The IDTF has also been involved in developing and testifying in support of, or in opposition to, legislative proposals dealing with the funding of capital defense in Arizona. The Task Force participated in the development of legislation creating the standards for the appointment of counsel and for the funding of representation at the state post-conviction stage in capital cases. Among the most important undertakings of this Task Force has been the successful effort to secure an amendment to Rule 6.8 of the Arizona Rules of Criminal Procedure to require lawyers in capital cases to be guided by the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.

16. For several years I also served on the Arizona Supreme Court's Committee for the Appointment of Counsel to represent death row inmates at the State post-conviction relief stage. I participated in the drafting, review and ultimate establishment of the rules governing the appointment of death penalty counsel under A.R.S. §13-4041 and Rule 6.8 of the Arizona Rules of Criminal Procedure.

17. I have co-authored several articles that have appeared in the *Arizona Attorney Magazine* relating to the funding of capital defense, and I have spoken and participated in numerous seminars and programs on this subject. As an adjunct member of the ASU Law School faculty, I team-taught the Death Penalty course in the spring of 2002. During the 2003-04 and 2006-07 school years, I team-taught a 4-hour credit seminar at ASU on the causes of wrongful convictions in Arizona and nationally.

4

4633616v1

Included in the curriculum was the study of ineffective assistance of defense counsel. In the fall of 2008, I taught a course entitled "Criminal Justice Failures and Reforms" at Elon University School of Law in Greensboro, North Carolina. A significant element of this course was the history of the law and practical realities of systems of indigent defense in capital cases.

18.    For the last 14 years, I have served as the Chair of The Justice Project of Arizona Attorneys for Criminal Justice, and in that capacity I have been involved in the evaluation of hundreds of cases alleging ineffective assistance of counsel at trial and sentencing in non-capital cases. The U.S. Supreme Court recently ruled in favor of one of the Justice Project's federal habeas corpus cases, *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), in which the Court held that the ineffective assistance of counsel at the post-conviction stage could constitute good cause to excuse a procedural default.

19.    I testified in October 2002, as an expert witness on ineffective assistance of counsel in a post-conviction relief proceeding in *Lacy v. Arizona*, Case No. CR 1995-000713. In that case, the Maricopa County Superior Court reversed a homicide and assault conviction based in part on ineffective assistance of defense counsel. I have also testified and served as an expert in the capital post-conviction proceedings in *Arizona v. Kayer*, CR 1994-0694, in the Superior Court of Yavapai County, and as an expert in the post-conviction proceeding in *Arizona v. Murdaugh*, Case No. CR 1995-006472, in the Superior Court of Maricopa County. In December 2010, I testified as an expert witness in a post-conviction proceeding in Connecticut State Court, in *State v. Wargo*, 53 Conn.App. 747, 731 A.2d 768 (1999).

5

4633616v1

20.     At present, I am serving as a death penalty defense standard of care expert in four post-conviction cases; three in Arizona and one in Colorado.

21.     Most recently, I testified as a standard of care expert in the case of *United States v. Brandon Basham*, No. 02-cr-992-JFA (D.S.C.).

22.     My opinions are based in significant part on my experiences as "learned counsel" in federal death penalty cases.  In addition to my direct involvement in federal death penalty cases, I have also conferred on numerous occasions with Federal Capital Defense Resource Counsel about the duties and responsibilities of capital trial counsel. In particular, I have conferred with federal defense counsel about the Department of Justice's process for the Government's consideration of whether to seek the death penalty.

23.     In the course of the federal death cases to which I have been appointed, and on other matters involving capital litigation, I have frequently been involved in the planning, development, and presentation of mitigating evidence, and the pre-trial investigation necessary in the course of developing mitigating evidence and preparing to address and respond to the Government's anticipated aggravating factors.

24.     Counsel for Mr. Caro have asked me to address questions with respect to the standard of care for attorneys representing a defendant in a federal death penalty case. I have undertaken a preliminary review of materials related to the representation of Mr. Caro at the pretrial, trial, and penalty phases, as well as direct appeal.  Based on that review as informed by my experience and training summarized above, I offer the following opinions and observations.

25.    From the outset of the representation of a person charged with a federal death-eligible offense as was the case with Mr. Caro here, defense counsel must commence preparing for all phases of the case, including most importantly both the guilt/innocence and the penalty phases. Counsel must recognize that capital trials require a defense that is cognizant of the reality that the defendant is likely to be found guilty by the jury and that the same jury will then weigh aggravating and mitigating evidence. In this case, there was little doubt that Mr. Caro killed Mr. Sandoval. From opening statements through the conclusion of the penalty phases of the trial, the defense conceded Mr. Caro's responsibility for the killing of his cellmate.

26.    What was in doubt from the outset of the representation of Mr. Caro was both the level of his culpability for the death of Mr. Sandoval and whether that act warranted the penalty of death. The defense, from the outset, had to focus on attempting to save the client's life.

27.    Inescapably, much of the foundation for the presentation of both aggravating and mitigating evidence will have been laid during the presentation of evidence at the guilt/innocence stage. Given this reality, several key principles should have dominated the defense effort from the outset: (1) defense themes must be developed on an ongoing basis; (2) those themes must permeate all aspects of the defense work in the case; and (3) the investigation essential to the development of defense themes must commence immediately and inevitably will require time and resources.

28.    The simultaneous investigation of facts underlying the charged offense and the social history and mental health issues is always a challenging task for defense

7

counsel and their team members. It is inconceivable that an appropriate investigation into these issues could be accomplished in as little as six months. Many jurisdictions, including Arizona, routinely contemplate that pretrial preparation will require two years and in some cases more. There are many reasons why more time is required in capital cases than might be necessary in noncapital cases, but whatever the specific needs of any cases, it is virtually certain that competent investigation and preparation cannot be realized in a matter of months. As the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases underscored in 2003, a thorough investigation of the defendant's life history and mental development is both essential and time-consuming. In recognition of the critical role of mitigation development, the ABA published Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty cases in 2008. These Guidelines are a compilation of the standards and practices that guided death penalty defense counsel at the time of the appointment of the defense team in Mr. Caro's case. Taken together, and underscored by now hundreds of reported cases, the central importance of thorough mental health development is no longer doubted.

29. The standards of performance for defense counsel in death penalty cases are national standards. These standards are rooted in federal constitutional guarantees. Federal death penalty cases are most certainly subject to a single set of responsibilities for defense counsel. There is no basis for concluding that a defendant prosecuted in the Western District of Virginia is entitled to less time to prepare, less court-authorized financial assistance in order to prepare, or less effective defense counsel.

4633616v1

30.    The defense team in this case presented no mental health/mental defect testimony at either the guilt/innocence phase or at the penalty phase.  The defense did secure the appointment of an expert to conduct a neuropsychological evaluation, but ultimately presented no mental health testimony.  While this investigation may well properly involve a neuropsychological evaluation, there is no substitute for a thorough mental health evaluation, which may require—as it did here—a combination of experts and consultants.

31.    Since virtually every federal death penalty case requires court-authorized funding, an important part of the obligations of defense counsel is to begin from the outset to obtain adequate resources.  This process often requires helping the court to understand why an extensive background investigation of the client's life history and mental state history is necessary.  This is one of the reasons why it is indisputably true that case preparation in federal death penalty cases cannot be accomplished in six months or a year.  Many federal courts are unfamiliar with the unique resource requirements of death penalty cases.  The need for frequent, on the record, ex parte sealed proceedings may not be entirely evident to the Court.  In my experience, federal judges are usually generally familiar with typical Criminal Justice Act (CJA) funding procedures, but these typical procedures are not predictive of the needs in capital cases.  This is not intended as in any way a criticism of federal judges.  Rather, it is a statement of an important element of the responsibility of defense counsel.  Just as defense counsel needs specialized expertise, the court and those responsible for funding capital defense need to become educated on the requirements of capital defense.

9

4633616v1

32. The representation of Mr. Caro may have presented challenges in terms of securing adequate time and resources. The crime charged involved the presentation of only a few witnesses. It may well have been the case that all parties—the prosecution, defense, and the court—began by assuming that the case could be brought to trial in a matter of months. It was the duty of defense counsel, however, to work from the outset to assure that time was available, and resources secured, to undertake a thorough life history for Mr. Caro and to investigate fully his social and mental history. The need for this full development is particularly important in a case in which it is apparent from the outset that the defendant grew up in a community and society where drugs and violence were a part of everyday life.

33. Prison killing cases present special concerns. First, as was the case here, the Government's case is likely to be based on the testimony of incarcerated informants. Jailhouse or prison "snitch" testimony requires thorough investigation. It is now well established (thanks in significant part to the examination of DNA-based exonerations) that false and unreliable inmate testimony is one of the key causes of wrongful convictions. Secondly, as was also the case here, there are often other inmate witnesses who the Government does not intend to call as witnesses, but who have relevant information that may contradict an informant's testimony. Thirdly, it is important for defense counsel to thoroughly investigate whether any prison-related homicide is most properly understood as deserving of an instruction on lesser included offenses and/or on self-defense. Many prison homicide cases—and this case is one good example—might well not be genuinely regarded as premeditated first-degree murders. Defense counsel

4633616v1

must carefully consider whether the jury could come to appreciate that an inmate-on-inmate homicide involves unique mental health and other severe stresses warranting a finding of second-degree homicide, manslaughter, or in some cases an acquittal based on self-defense.

34.    This case presented a classic case of the difficulties that can be anticipated when the Government chooses to rely on inmate testimony to support an allegation of premeditated murder.  The only "eye-witness" offered in the case was Mr. Bullock, an inmate in the Special Housing Unit (SHU) who resided across the hallway from the cell in which Mr. Caro and Mr. Sandoval were housed.  Given that premeditation was the central issue at trial, Mr. Bullock's various descriptions of what he observed became key.  The necessary investigation and preparation for trial should have focused on the development of evidence that might undermine this inmate's testimony.  It is evident that Mr. Bullock had a cellmate.  What he may have observed and what Mr. Bullock may have told him about what Mr. Bullock observed would have been critically important.

35.    Prison killing cases charged as capital crimes almost inevitably will be based on a prosecution claim of future dangerousness.  Defense counsel must know this and plan to respond thoroughly to this non-statutory aggravating circumstance.  Competent responses to this aggravating factor require expert assistance on prison management.  The federal Bureau of Prisons (BOP) is equipped to eliminate the material risk of future assaults by inmates who pose the greatest internal security risks.  A thorough understanding of this topic is necessary in approaching the trial and penalty phases.  While the defense team was certainly aware of the importance of this

11

4633616v1

aggravating factor, it appears that they may have failed to appreciate the extent to which jurors are affected by concerns about the ability of a prisoner to inflict injury in the future.

36.    Similarly, gang-related capital cases also present predictable areas requiring defense preparation.  Very typically the Government can be expected to argue that, unless executed, the defendant will continue to communicate with and instruct other gang members to commit acts of violence both inside and outside the prison.  BOP also has in place systems and procedures to deal with security threat groups (prison gangs).  Defense counsel should anticipate that it will be important to the jury to know that these systems and procedures can reduce if not eliminate the risk of future dangerousness.  The defense effort in this regard—relying on Messrs. Aiken and Cunningham to rebut the testimony of the Government's expert, Mr. Hershberger—was deficient.  (My opinions with respect particularly to prison homicide issues are informed by my experience as court-appointed counsel for inmates seeking protective custody in the Arizona prison system and by my direct involvement as plaintiffs' counsel in jail conditions cases.  My opinions in this respect are also informed by my representation of defendants in federal death penalty cases in Arizona, New Mexico and California.)

37.    Another important part of defense counsel's obligation in capital cases is to investigate and to challenge where appropriate prior convictions that may be used by the Government as aggravating factors.  This is an important obligation irrespective of whether the defendant was convicted after a trial or entered a plea of guilty in prior cases. In this case, the conviction of Mr. Caro in connection with the stabbing death of inmate

12

4633616v1

Benavidez became an important element of the Government's case in support of aggravation. Counsel had a duty to investigate and challenge that underlying conviction.

38.    I appreciate the difficulties that defense counsel in this case encountered, but I respectfully conclude that their performance fell below the standard of care for death penalty defense in the ways I have identified above. I also have the following additional concerns.

### The Department of Justice Death Penalty Certification Process

39.    It is my opinion that reasonably competent counsel in Mr. Caro's case should have aggressively pursued the opportunity afforded by the Department of Justice's Death Penalty Certification process to seek a determination that his case was not one in which the death penalty should have been pursued. My opinions on this question are informed by my participation in the process on numerous occasions and having consulted with other capital defense counsel who have been involved in making presentations to the Department of Justice's Death Penalty Review Committee.

40.    This phase of the capital defense is particularly important in cases in which the Department of Justice is necessarily considering whether this prison homicide should be treated differently from other prison-related homicides. A greater understanding of Mr. Caro's mitigating evidence, coupled with a greater appreciation of the prison environmental factors should have been presented so that the Attorney General might better evaluate both the aggravating and mitigating circumstances. Again, more time to prepare and to work with the development of the factual investigation and the penalty phase facts would have been valuable. It is apparent from a review of the documents

13

from early 2005 that the defense team had only begun to develop its case when they went to Main Justice for the Committee meeting. The fact investigator appears to have been engaged only a very few months before the Main Justice meeting and the mitigation specialist had not begun to actively develop Mr. Caro's personal history.

41.    I understand the argument sometimes made that defense counsel does not want to "give away" defense strategy and themes, but that argument needs carefully to be weighed against the importance of the opportunity to achieve a "no death" decision. As with other effective presentations in capital cases, the importance of a written as well as an oral presentation should not be understated. Especially where the Death Penalty Review Committee may be composed of members some of whom will be in attendance at the oral presentation and some of whom may not, the written presentation may be only way to assure that decision makers see defense counsel's arguments. In this case, it does appear that some of the Department of Justice participants were not physically present but appeared instead by videoconference. It also appears from a review of the relevant correspondence that the defense team was aware of this possibility. Effective presentation always suffers when important communications are handled by a combination of in-room and videoconference connections, but the loss in communication effectiveness might have been ameliorated by a written presentation.

42.    It is also important for defense counsel to keep in mind that the Attorney General is the ultimate decider, and particularly in cases like this one involving important policy questions (the BOP's ability to distinguish among homicide cases occurring in its institutions, etc.), the personal consideration by the Attorney General should be

14

4633616v1

anticipated. The views of counsel for Mr. Caro at this stage should not have been filtered through the Committee members. There have been dozens of homicides that have occurred in BOP. Only a very few have resulted in a decision by the Attorney General to seek the death penalty. The Justice Department claims to have a system for deciding which cases should precede as death penalty cases, *i.e.*, that the Government can differentiate whom among these defendants should be candidates for death. The defense team did develop a greater understanding of these issues as the case progressed, but at the time of the Committee presentation the defense team had not yet secured the assistance of experts and consultants to aid them in developing a theme for life.

### Advising the Client About the Consequences of a Guilty Plea

43. It is my opinion that defense counsel representing Mr. Caro in the Benavidez prosecution fell below the standard of care in failing to properly advise Mr. Caro of the consequences of his plea in that matter.

44. One of the aggravating circumstances alleged and established by the Government in the Sandoval case involved Mr. Caro's plea of guilty to murder in another prison killing case. It is evident that Mr. Caro's plea in that case would be used by the Government as part of its aggravation case, yet it also appears that capital defense counsel took no steps to attack that plea. Reasonably competent capital counsel must examine all criminal convictions that may be used to enhance the client's sentence— especially any conviction that may be used to support an aggravating circumstance as was the case here. A proper examination of the circumstances surrounding Mr. Caro's plea in that case would have revealed that he was not advised of the important

15

4633616v1

consequence of his plea, *i.e.,* that it could be used in the Sandoval case as an important underpinning supporting the Government's successful effort to seek the death penalty.

45.    While the United State Supreme Court has focused greater attention on the critical importance of counsel in connection with guilty pleas, competent counsel have long known and emphasized the duty fully to advise a client of all of the direct and collateral consequences of a plea. Mr. Caro was not advised by counsel in the Benavidez matter that pleading to conspiracy to commit first degree murder would have been used to support an aggravating factor in the Sandoval penalty phase.

### Development of Mitigating Evidence

46.    It is my opinion that defense counsel for Mr. Caro fell below the standard of care in failing fully to investigate and develop issues with respect to mental health issues. As noted above in this Declaration, the development of mitigating evidence with respect to a capital defendant's mental history is a critical component of the capital defense function. In this case, it appears that defense counsel first secured the appointment of an expert consultant to perform a neuropsychological evaluation. It further appears that defense counsel's plan was to defer considering other mental state experts until the neuropsychological evaluation was completed. This approach falls far short of the standard of care. All of the relevant case law and secondary literature about the development of mitigation emphasizes that defense counsel must undertake a comprehensive examination of mental health issues.

16

4633616v1

47.    To whatever extent the failure to develop Mr. Caro's complete history was the result insufficient time, defense counsel should have been advocating the need for great time and greater resources.  There is no substitute for a thorough life history as a foundation for expert testimony.  Developing that history does take time and it takes money, but there is no reason to believe that both the time and the resources would not have been available.

48.    Defense counsel knew that Mr. Caro had brain damage.  They knew that he had a traumatic childhood.  Counsel nonetheless failed to secure the necessary experts to present this information to the jury.  The standard of care for defense counsel requires the full development and appreciation of these issues.  Had defense counsel developed the information there is no reason why they would have determined not to present it to the jury in this case.

## Failure to Conduct Appropriate Investigation

49.    It is also my opinion, as noted above, that defense counsel fell below the standard of care in failing to investigate information with respect to the testimony offered by the Government from an inmate housed directly across from Mr. Caro's cell with respect to the credibility of the incriminating testimony offered by that witness. I wish to emphasize this concern as it appears to have permeated this case from beginning to end. Exactly how the death of Mr. Sandoval occurred turned out to be the difference between a life or death sentence for Mr. Caro. The image of the planned and violently executed strangulation dominated the Government's closing arguments. The Government was able

17

4633616v1

to weave together the circumstantial evidence and Mr. Caro's incriminating statements with Mr. Bullock's account to paint a picture that could only have propelled the jury to find as it did - that this homicide deserved the death penalty.

50.    The record in this case reveals that the chief cooperating witness for the Government may have had a motive to provide inaccurate and misleading testimony. It is also apparent that this inmate had a cellmate. Grand jury testimony makes this evident, although presumably defense counsel would have known or expected that other inmates in the Special Housing Unit at the USP Lee would have had cellmates. For the reasons described above, a thorough investigation should have been undertaken prior to trial.

## Failure to Seek removal of Juror

51.    During the trial, the Court observed that one juror appeared to be sleeping during testimony. After conferring with counsel the Court decided not to remove the juror. Attention to all testimony is central to the role of jurors as fact-finders. Any juror who cannot maintain full attention should have been removed. Here, there were four alternates. There was no material risk that removing the juror would occasion a mistrial. Defense counsel should have moved and strongly advocated for the dismissal of that juror. (My opinion on this topic is informed by my participation in several lengthy trials in which sleeping or noticeably inattentive juror behavior occurred. The defense team in these cases debated the tactical pros and cons of seeking removal; we conferred with other defense counsel who had encountered similar situations; and we ultimately concluded that the defendant's entitlement to a unanimous jury required that all jurors were engaged in the hard job of receiving testimony.)

18

4633616v1

### Appellate Counsel's Duties

52.     Appellate and post-conviction defense counsel in death penalty cases have special duties not always encountered by defense counsel in noncapital cases. Most important among those duties is the duty to advocate for reconsideration and change in the law affecting the constitutionality of the death penalty. No other field of criminal defense representation has been so marked by dynamic change. The duty to advocate for reversal of the death sentence is especially important when the case is on direct appeal. The jurisprudence of the law of retroactivity has often distinguished between cases that have become "final judgments" and those that have not. New rulings may benefit those convicted defendants whose cases were on direct appeal—or who raised the same issue underlying that ruling on direct appeal.

53.     In this case, appellate counsel failed to allege that the jury was improperly instructed on the standard for weighing aggravation against mitigation. A good faith basis certainly existed in this case to claim that the jurors should have been instructed that aggravation must outweigh mitigation beyond a reasonable doubt. The jury in this case found mitigating circumstances, and they found them unanimously. Yet, the jury was never told to weigh those mitigators against the aggravators—especially future dangerousness—by any particular standard of proof. Had they been so instructed, given the relative weakness of the non-statutory aggravators, it is reasonable to conclude that the jury would not have found that this defendant deserved a sentence of death.

54.     Had the defense undertaken and presented a full mitigation case as contemplated by the ABA Guidelines, there could be little doubt that the jury would have

19

4633616v1

found it difficult to conclude that the Government's aggravating evidence outweighed that mitigation beyond a reasonable doubt. (My opinions on this topic are informed by my experience as part of the post-conviction team that ultimately succeeded in securing the reversal of the death sentence for Timothy Ring in *Ring v. Arizona,* 536 U.S. 584 (2002). The Court's decision in that case directly overruled its own precedent regarding the role of the jury as fact-finder—a decision that was only 10 years old. My opinions are also based on the increasing frequency in the numbers of cases in which Justices of the United States Supreme Court have come over time to change their views on the application of the Eighth Amendment. Justices Blackmun, Powell and Stevens are three prominent examples of the potential that opinions on the constitutionality of the death penalty both on its face and as applied are subject to change.)

### Concluding Observation

55.    My expectation based on my experience in providing standard of care opinions in other cases is that I should form additional opinions that will be informed by a consideration of the Government's Response to Mr. Caro's Petition and a further review of Declarations that may be presented by either party and by a further review of the materials in the file in this case.

DATED this 8th day of January, 2013.

Larry A. Hammond

20

# OSBORN MALEDON



# Larry A. Hammond

Phone: (602) 640-9361  |  Email: lhammond@omlaw.com

Larry has spent over 30 years practicing in the private sector, but regards his two tours with the Department of Justice as among his most satisfying professional experiences. He served as an Assistant Watergate Special Prosecutor in 1973-1974 and then returned to Justice during the Carter Administration where he worked in the Office of Legal Counsel as the First Deputy Assistant Attorney General under both Attorneys General Griffin Bell and Ben Civiletti.

2929 North Central Avenue
Twenty-First Floor
Phoenix, AZ 85012-2793

## Education

- J.D., University of Texas, 1970; *Texas Law Review*, Editor-in-Chief, 1969-1970; Order of the Coif
- B.A., University of Texas, 1967

## Bar Admissions

- Arizona, 1975
- California, 1971

## Court Admissions

- U.S. Court of Appeals, Tenth Circuit, 2004
- U.S. Court of Appeals, Ninth Circuit, 1984
- U.S. Court of Appeals, Sixth Circuit, 1984
- U.S. Supreme Court, 1977
- Arizona Supreme Court, 1975
- California Supreme Court, 1971

## Clerkships

- U.S. Supreme Court, Justice Lewis F. Powell, Jr., 1971 - 1973
- U.S. Supreme Court, Justice Hugo L. Black, 1971
- U.S. Court of Appeals, District of Columbia Circuit, Judge Carl McGowan, 1970 - 1971

## Practice Areas

- Commercial Litigation
- Criminal Defense
- Internal and Governmental Investigations

## Representative Matters

- *State ex rel. Napolitano v. Gravano*, 204 Ariz. 106, 60 P.3d 246 (App. 2002)

## Awards & Recognition

- 23 Osborn Maledon, P.A. Lawyers Named 'Best' in National Publication
  Twenty-three of the 51 attorneys in the Phoenix law firm of Osborn Maledon, P.A. have been singled out for national recognition in the new 2012 edition of Best Lawyers®, the oldest peer-review publication in the legal profession.
- Osborn Maledon, P.A. Attorneys Named to *Super Lawyers* List
  Fourteen of the 49 attorneys at Osborn Maledon, P.A., a Phoenix law firm, have been named to the *Southwest Super Lawyers 2011* list.
- Osborn Maledon, P.A. Practice Groups and Attorneys Ranked as Tops in Chambers Guide
  Three practice areas in the Phoenix law firm of Osborn Maledon, P.A. received the highest possible ranking among Arizona law firms for the seventh year in a row in the 2011 ranking by the prestigious legal resource guide, Chambers USA.

© Copyright Osborn Maledon, P.A., All Rights Reserved



*Order of the Samaritan for Public Service and Criminal Justice*, University of Alabama School of Law, March 2011

*The International Who's Who of Business Crime Defense Lawyers*, 2011

Morris Dees Justice Award, 2010

Larry Hammond Endowed Criminal Law Scholarship at the James R. Rogers College of Law at the University of Arizona, established in 2008

Justice Award, The American Judicature Society, 2008

John Flynn Award, Arizona Attorneys for Criminal Justice, 2008

Maricopa County Hall of Fame, 2008

Distinguished Honorary Alumnus Award, University of Arizona Law School, May, 2004

Judge Learned Hand Award for Community Service, Arizona Chapter of American Jewish Committee, March, 2003

Arizona State Bar Foundation Walter E. Craig Award for Career Service, 2001

President's Commendation, Arizona Attorneys for Criminal Justice, January, 1997 and 1999

Civil Libertarian of the Year, Arizona Civil Liberties Union, 1993, 2000

Pro Bono Service Award, State Bar of Arizona, 1991

Exceptional Service Award, U.S. Justice Department, 1980

Federal Younger Lawyer of the Year, 1980

Chambers USA, *America's Leading Lawyers for Business*, Litigation: White-Collar Crime & Government Investigations, 2004-2011

*The Best Lawyers in America*®, Appellate Law, Bet-the-Company Litigation, Commercial Litigation, White-Collar Criminal Defense, editions 1995-2012

Best of the Bar, *Business Journal*, Pro Bono, 2005

*Southwest Super Lawyers*, Top 50 Arizona Attorneys, 2007-2010

*Southwest Super Lawyers*, Criminal Defense: White Collar, 2007-2012

*Arizona's Finest Lawyers*

## Professional Activities

American College of Trial Lawyers, Fellow, 2011

American Judicature Society, President and member of Executive Committee, 2003-2005, Board of Directors, 1995-2007, Criminal Justice Reform Committee, Chair 1992-present

Arizona Attorneys for Criminal Justice, Justice Project Chair, 1998-present

American Bar Association, Biological Evidence Task Force, 2003-2005

American Bar Association, Task Force on War Crimes in the Former Yugoslavia, 1993-1995

© Copyright Osborn Maledon, P.A., All Rights Reserved



Arizona Capital Representation Project, of Directors, 1988-present, Vice President, 1988-present

Arizona State Bar Association, Indigent Defense Task Force, 1995-present

Human Rights First, Lawyer Steering Committee (formerly known as the Lawyers' Committee for Human Rights)

Elon University College of Law (Visiting Professor; Advanced Criminal Procedure) 2008

Sandra Day O'Connor College of Law at Arizona State University (Adjunct Professor of Law:  Advanced Criminal Procedure, Death Penalty, Presidential Powers,  Advanced Civil Discovery, and Ethics)

University of Arizona College of Law (Adjunct Professor of Law:  Presidential Powers), 1995

Arizona State University Undergraduate School (Guest Faculty Member:  Death Penalty, Practicum re: The Justice Project)

Birmingham City University, School of Law, United Kingdom, (Visiting Professor; Center for American Legal Studies)

St. John's College, Santa Fe, New Mexico (Tutor:  Seventeenth Century Literature - 1983)

University of New Mexico School of Law (Trial Practice - 1983)

## Publications

- Sentence Must be Fair: Death-Penalty Defendants Need Competent Attorneys
  The Arizona Republic, May 12, 2012
- Capital Case Crisis in Maricopa County, Arizona: A response from the Defense
  Judicature, March / April 2012
- Innocent Until Interrogated
  Law Journal for Social Justice, May 2, 2011
- John Sears, John J. Flynn Lifetime Achievement Award 2011
  The Defender, April 21, 2011
- Why Should You Oppose the Death Penalty?
  The Arizona Republic, April 15, 2011
- Opinion: What Did Jeffrey Landrigan's Execution Teach Us About Respect?
  Maricopa Lawyer, November 6, 2010
- Protecting Moscow from the Soviets – Book Review
  Experience, 2009
- Napolitano will Defend State Death Penalty Law before Supreme Court
  The Arizona Republic, April 21, 2002

Opinion, *Ariz. case to test rights of convicted in Supreme Court*, The Arizona Republic, October 4, 2011

Viewpoint, *The failure of forensic science reform in Arizona*, Judicature, May-June 2010

*Sotomayor is Newest Face in a Long Line of Heroes*, The Arizona Republic, August 10, 2009 (author)

Editorial for Judicature, *Setting Forensic Science on a New Path*, March-April 2009 (unsigned editorial co-authored with Dr. Barry Fisher of the Los Angeles County Crime Laboratory)

*Counsel for The Indigent Accused in Death Penalty Cases*, The Defender (Winter 2006), co-author

Presentation:  Speech to the Harris County Bar *The Landscape of Criminal Justice:  Texas and Beyond*, May 21, 2004

© Copyright Osborn Maledon, P.A., All Rights Reserved



Justice Project Editorial, *Why Gideon Mattered to Hugo Black*, The Champion, January/February 2003 (reprinted in The Defender, April 2003)

Editorial, *Justice Project: 5 Year Report*, The Defender, January 2003

Editorial, *Restoring Confidence in the Criminal Justice System*, Judicature, 2002 (unsigned)

*Justice Project: Status Report and Update*, The Defender, July 2002

*Scrutiny a Must in Criminal Cases*, The Arizona Republic, January 2002 (Co-author)

*Capital Punishment in Arizona and The "New" Death Penalty Debate,* The Defender, June 2001 (Co-author)

*Popular Culture and The Death Penalty*, The Defender, July 2000 (Co-author)

*Aiding the Incarcerated*, Litigation Magazine, Winter 2000 (Co-author)

*Aryan Brother's legacy is safer prison system*, The Arizona Republic, February 6, 2000 (Co-author)

*The Justice Project: Y2 OK!*, The Defender, January 2000 (Co-author)

*Worldwide Concern: We Should Offer Global Support to Those Fighting for Human Rights Anywhere*, Arizona Journal, August 9, 1999 (Co-author)

Editorial on Felony Murder: *Bad Law Needs Reining in for Sake of Fairness*, Arizona Republic, May 14, 1999

*May God Have Mercy: A True Story of Crime and Punishment*, Judicature, November-December 1998

*U.S. Has Everything to Gain From an International Criminal Court*, Nov. 9, 1998 Arizona Journal (reprinted in the Colorado Journal, Nevada Journal, and Washington Journal)

*Prisons Lack Commitment to Safety*, Arizona Republic, April 12, 1998 (Co-author)

*Arizona's Crisis in Indigent Capital Representation*, Arizona Attorney, March 1998 (Co-author)

*Observations on the Mock Impeachment Trial of Abraham Lincoln*, 40 Ariz.L.Rev. 351 (1998)

Editorial on Capital Execution: *Jose Ceja Didn't Deserve to Die*, Arizona Republic, January 25, 1998

*New Rules, on Indigent Representations*, Arizona Attorney, February, 1997 (Co-author)

© Copyright Osborn Maledon. P.A., All Rights Reserved

# EXHIBIT 5

# EXHIBIT 5

## DECLARATION OF STEPHEN J. KALISTA

I, Stephen J. Kalista, declare under penalty of perjury the following:

1. I am an attorney and had licenses to practice in Virginia and Georgia. I am currently retired but practiced law from June, 1976 to December, 2007.

2. I, along with James Simmons, represented Carlos Caro in his capital murder case, No. 06-cr-00001-JPJ-1, in the United States District Court for the Western District of Virginia.

3. When I was appointed to represent Mr. Caro, I had represented four capital defendants who were prosecuted by the state of Virginia and one capital defendant who was prosecuted by the Federal Government.

4. I was appointed to represent Mr. Caro in January 2005, in the case involving the death of Roberto Sandoval. At that time, the Government had not yet indicted Mr. Caro nor had it received death certification from the Department of Justice (DOJ).

5. After Mr. Simmons and I were appointed, we sought and received funding so that investigation related to mitigation could begin.

6. Mr. Simmons and I did not present anything in writing to the DOJ but attended in person the meeting in June 2005.

7. In October 2005, we learned from the Government that the DOJ had authorized death.

8. In January 2006, Mr. Caro was indicted and charged with first-degree premeditated murder, as well as three statutory aggravating factors. At that time, a trial date was set for July 2006. I felt that was sufficient time to prepare for trial.

9. From the beginning, Mr. Simmons and I believed this would be a penalty-phase case and that our best result would be a life sentence. We did not divide the responsibilities in the case in a certain manner. We both worked on all aspects of the case.

10. We also knew from the beginning that this case involved gang activity and that the Government would be presenting information regarding this. We were aware that the Government would argue that Mr. Caro posed a future threat at least in part because of his gang activity and would use his prior actions in prison against him.

11. We attempted to present an argument during the guilt/innocence phase that Mr. Caro did not act with premeditation but rather acted in the heat of passion. I do not recall considering a self-defense argument.

12. Hans Selvog, Ph.D., ended up working as the mitigation specialist on Mr. Caro's case. Mr. Simmons recommended that we use Dr. Selvog after Lee Norton indicated that she would not be able to work under the court's hold-back provision. While Mr. Simmons and I relied upon Dr. Selvog for recommendations related to mitigation experts, I believe that I initially located neuropsychologist Malcolm Spica, Ph.D., before Dr. Selvog was retained.

13. Dr. Spica conducted neuropsychological testing of Mr. Caro. Dr. Spica provided a report that indicated Mr. Caro had brain impairment and suggested that we consult with forensic psychiatrist Keith Caruso, M.D.

14. Dr. Selvog may have recommended that we consult with a neonatologist. I do not recall speaking with a neonatologist.

15. We hired Dr. Caruso, who evaluated Mr. Caro. When Dr. Caruso was retained, we had not determined whether testimony from a mental health expert would be introduced during the guilt/innocence or the penalty phase or both. Therefore, Dr. Caruso interviewed Mr. Caro about the crime, and he learned information that was not helpful to the defense. We did not ask to hire another psychiatrist to specifically testify at the penalty phase. We did not ask to hire a consulting expert.

16. After Dr. Caruso's examination of Mr. Caro, we provided notice that we would introduce a mental health defense during both the guilt/innocence phase and the penalty phase. Shortly thereafter, we withdrew our notice of

the intent to introduce a mental health defense during the guilt/innocence phase.

17. We learned that the Government would be using Dr. Robert Phillips as its expert. We immediately sought information on Dr. Phillips, and found out that he had a good reputation and was known to present well on the stand.

18. At some point during trial, we decided that we were not going to present mental health testimony during the penalty phase. We did not review Dr. Phillips's report. We made this decision based on the reputation of Dr. Phillips, his anticipated testimony, and a feeling that we could not rebut that testimony.

19. We went to the penalty phase of Mr. Caro's trial without any expert mental health witnesses. I handled the opening statement for the penalty phase. I also handled the examination of several witnesses.

20. This was a difficult case. There was not much in Mr. Caro's personal life that we felt we could present to a jury to humanize Mr. Caro. He cheated on his wife; he was not a good father; he was a three-time loser as far as drugs; and he had difficulty while incarcerated. I think we did the best we could under the circumstances, although in the end, I don't think we were able to sufficiently humanize him.

21. I was aware that the Government was going to introduce testimony from Sean Bullock, who was housed across from Mr. Caro at the time Roberto Sandoval was killed. I received a copy of the grand jury transcript where Mr. Bullock testified. I reviewed the housing unit logs from USP Lee. I overlooked the fact that Mr. Bullock had a cellmate at the time of Mr. Sandoval's death. There was no strategic reason for not interviewing Mr. Bullock's cellmate.

22. I knew that Mr. Caro's other convictions and sentences would be used as both statutory and non-statutory aggravating circumstances. I did not pursue any collateral challenges to any of Mr. Caro's previous convictions and sentences. I had no strategic reason for failing to do so.

23. I recall that Mr. Caro pled guilty to conspiracy to commit murder of inmate Benevidez as part of a plea agreement but that an equally culpable co-defendant received a much lesser sentence. I was also aware that the principal co-defendant involved in planning the attack on Mr. Benevidez, and all other co-defendants in that case, pled guilty and received substantially lower sentences.

24. Prior to signing this declaration, I spoke with Mr. Caro's current counsel and reviewed various portions of his case file they provided to me. This declaration is not meant to be a complete description of every aspect of my representation of Mr. Caro.

I declare under penalty of perjury that the foregoing is true and correct.

Stephen J. Kalista

12/29/2012

Date

# EXHIBIT 8

# EXHIBIT 8

## Declaration of Donna Marie Schwartz-Watts, M.D.

I, Donna Marie Schwartz-Watts, M.D., declare under penalty of perjury:

### Professional Background

1. I am a physician licensed to practice medicine.

2. I completed medical school in 1989, and graduated from the University of South Carolina School of Medicine.

3. I am Board Certified in General Psychiatry and have Added Qualifications in Forensic Psychiatry. My curriculum vitae is attached to my declaration as Exhibit A.

4. From June 1997 until June 2010, I was an Associate Professor and then Professor of Clinical Psychiatry and the Director of Forensic Services in the Department of Neuropsychiatry at the University of South Carolina School of Medicine. During my tenure at the University, I taught residents as well as treated patients. I conducted research and presented and published papers.

5. I am presently employed at Bryan Psychiatric Hospital as a Senior Psychiatrist. I treat people with post-traumatic stress disorder (PTSD) on a frequent basis. The treatment team I work with routinely screen all patients we treat for PTSD with a questionnaire. Many of our patients would not be diagnosed were it not for this specified form of screening. I remain a Department of Mental health Professor of Psychiatry at the University of South Carolina School of Medicine and a Clinical professor of Forensic Psychiatry at the Medical University of South Carolina. I continue to train medical students and residents in Forensic Psychiatry.

6. I also conduct psychiatric evaluations at the request of clients, attorneys, and courts in both criminal and civil cases. Throughout my career, I have conducted thousands of forensic evaluations. From November 1998 until June 2009, I served as a court-appointed psychiatrist (through a contract with the Department of Mental Health) under the South Carolina Sexually Violent Predator Statute. I

Page 1 of 10

have been qualified as an expert in both state and federal court approximately 750 times.

**Involvement in Carlos David Caro's Case**

7.    I was contacted by Assistant Federal Public Defender Robin Konrad and retained in *United States v. Caro*, 06-cr-00001. I was retained to review the prior evaluations conducted in preparation for Mr. Caro's trial, and to review information regarding Mr. Caro's background that was collected and prepared by defense counsel in preparation for trial as well as information presented during his trial. Upon Ms. Konrad's request, I evaluated her client Carlos David Caro, reviewed documents that I have been provided, and am now offering my opinion.

8.    I evaluated Mr. Caro on January 3, 2013. I met with Mr. Caro for approximately two hours at USP-Terre Haute, where most federal death row inmates are housed. This was a contact interview conducted at a table separating the two of us in a legal visitation room. Mr. Caro was restrained in handcuffs, a waist chain, and ankle restraints, consistent with the policies of the United States Bureau of Prisons. My initial evaluation consisted of an interview and mental status examination.

9.    In addition to my evaluation of Mr. Caro, I have reviewed records related to Mr. Caro including, but not limited to:
   - Neuropsychological Consultation, by D. Malcolm Spica, Ph.D., 06/19/2006 and 06/16/2006;
   - DVD of evaluation of Mr. Caro on 11/30/2006, by Dr. Robert Phillips, M.D., Ph.D., D.F.A.P.A.;
   - Report of Forensic Evaluation, by Robert Phillips, M.D., Ph.D., D.F.A.P.A., and Paul Montalbano, Ph.D., 01/29/2007;
   - Letter from Dr. Phillips to Honorable James Jones, 11/29/2006;
   - Declaration of Hans Selvog, Ph.D., L.C.S.W., 12/11/2006;
   - Testimony of Susannah Rodriguez, 02/07/2007 Trial Transcript pp. 69-115;
   - Testimony of Yomedia Martinez, Delia Contreras and Diamantina Razo, 02/07/2007 Trial Transcript pp. 123-171;

- Testimony of Laura Perez and Lou Yveth Caro, 02/08/2007 Trial Transcript pp. 2-63;
- Defense Trial Exhibit No. 8, Carlos Caro School Records;
- Defense Trial Exhibit No. 9, Letter from Brooks County ISD Director of Special Education to Dr. Hans Selvog;
- Time-line Narrative Chronological Critical Incidents and Developmental History of Carlos Caro.

10.    I have not reviewed all of the documents that Dr. Phillips indicated in his report he reviewed. It is my understanding from counsel that Dr. Phillips has destroyed those records.

11.    After conducting an evaluation and reviewing the records listed above, I offer the following information and opinions. I reserve the right to supplement this declaration and my opinions expressed here should I receive additional information.

### Background Information and Summary of Diagnoses

12.    After my initial evaluation of Mr. Caro and my review of his records, it is my professional opinion that Mr. Caro meets the criteria for the following disorders based on the Diagnostic and Statistic Manual of Mental Disorders (DSM-IV-TR).

| | |
|---|---|
| Axis I) | Anxiety Disorder NOS (PTSD), 300.00 |
| | Cognitive Disorder NOS, 294.9 |
| | Adult Antisocial Behavior, V71.01 |
| Axis II) | No diagnosis |
| Axis III) | No diagnosis |
| Axis IV) | Incarceration |
| Axis V) | 55 |

13.    I also informed Ms. Konrad that it is my opinion that Mr. Caro should be given a more complete neuropsychological evaluation, a Positron Emission Tomography (PET), and a repeated Electrocephalography (EEG), to determine his present cognitive functioning. He has long term and short term memory deficits. He performed poorly on tasks of verbal fluency and visuospatial design. He had a history of impairments and a prior abnormal EEG, which may have been of poor quality according to Dr. Phillips report. His family reports he had a history of staring off into space when he was younger. Mr. Caro could

Page 3 of 10

benefit from neuroimaging. Neuroimaging (PET) delineates brain function, whereas the MRI that Mr. Caro had delineates brain structure. Since he does give up on tasks due to frustration, the neuroimaging will complement his neuropsychological testing. Having a normal MRI means that Mr. Caro's brain structure is intact, but it is not a study of brain function.

14. During my mental status examination of Mr. Caro, he was reserved and only answered questions asked of him. He rarely offered spontaneous speech. He did not appear anxious, although when he became frustrated at a task, he would smile inappropriately. His affect was generally constricted, although he smiled appropriately a few times and on one occasion appeared sad when discussing the death of his mother. He also smiled inappropriately when performing cognitive tasks that were difficult. Mr. Caro was not psychotic, suicidal, or homicidal, although he has a foreshortened sense of the future. He was able to maintain eye contact.

15. On the cognitive screening testing I conducted, Mr. Caro was alert and oriented to all but the date, which he missed by one day. He had difficulty performing a task of abstraction. He could not explain how a car and train were alike. Only when prompted, Mr. Caro was able to respond, "they move." He was unable to abstract the similarity between a fly and a tree. Mr. Caro registered three items but was only able to recall two after five and ten minutes. He was not able to recall the third object with a clue and forced choice. He was unable to name three wishes when asked. He did answer "freedom."

16. On further cognitive testing, Mr. Caro performed poorly on a test of verbal fluency. He was asked to provide as many words as possible beginning with the letter "D." Mr. Caro was only able to provide four words before becoming anxious and repeatedly saying, "I don't know," not realizing that "don't" begins with a "D." He gave up on this one-minute task after 40 seconds. Mr. Caro also had difficulty reproducing a visual spatial design. Although, Mr. Caro was handcuffed he did not appear mechanically limited when completing the task. When reproducing two intersecting pentagons, he did not complete angles, and he overshot angles.

17. Mr. Caro's performance on cognitive testing is indicative of dysfunction based on his age, lack of head injury, and his reported abstinence from alcohol since his confinement. His performance is consistent with the more sensitive testing performed by Dr. Spica. There was no evidence that he was intentionally trying to perform poorly. He would give up on more difficult tasks after an initial good effort.

18. In his mental status examination, Dr. Phillips does not report doing verbal fluency cognitive screening tests. Dr. Phillips did not note short term memory impairment. The cognitive screening testing, however, is only screening; it is not intended to be used for the purpose of determining the extent of cognitive deficits.

19. Mr. Caro's history is significant in regards to the trauma he experienced and was exposed to during his developmental and formative years. Furthermore, the developmental delays which were reported by various family members prior to and during his trial are multifactorial. Developmental delays can be seen in children with cognitive impairments and in children who are exposed to trauma.

20. The reports prepared by prior evaluators that I have reviewed fail to discuss a complete trauma history for Mr. Caro. Some evaluators noted his exposure to abuse but did not record or review any symptoms of post-traumatic stress disorder or other anxiety disorders. If they had taken a complete trauma history, they would have identified several symptoms of PTSD that were reported and/or exhibited. For instance, Mr. Caro has difficulty recalling specific details of traumas he witnessed; he has a poor memory of his childhood. Mr. Caro avoids discussing witnessing his mother's physical abuse and avoids describing his own abuse at the hands of his brother. He denies having a startle response but admits being hyper alert when he is in the general prison population, which he refers to as the compound. Mr. Caro has noted a decrease in his alertness since he takes recreation alone due to his status.

21. Mr. Caro was born in Falfurrias, TX on February 9, 1967, to Jose Maria Caro Jr. and Virginia Rodriguez Caro. Mr. Caro was the second born of four children. All four children born to Jose Jr. and Virginia were boys. According to several family members, Mr. Caro

was a sickly infant who vomited frequently. He was unable to hold down milk or formula. After some time, the family realized that Mr. Caro was able to keep goats milk down. In addition to Mr. Caro being a sickly infant his mother was suffering from postpartum depression after giving birth to him. Mr. Caro did not walk until he was almost two years old. Family members reported that Mr. Caro stayed to himself and that he was known as "El Mudo," which means The Mute.

22. Mr. Caro's father was an abusive alcoholic with a criminal history who eventually died in 1987 from cirrhosis of the liver. Prior to his father's death, Mr. Caro endured a childhood filled with witnessing his father beat his mother. It was not uncommon for Mr. Caro's father to come home drunk to their small, one bedroom home and beat his mother severely. His father would beat his mother on a daily basis because he was drunk on a daily basis. Mr. Caro's siblings recall their father beating their mother and giving her black eyes.

23. It did not take long for Mr. Caro's older brother, Jose III, to learn from their father's physical abuse. Mr. Caro would often be punched or hit by his older brother Jose III. Mr. Caro never knew why his brother would beat him, but he recalls it happening frequently. He reports that he does not recall fighting back. As a child, not knowing when or why the beatings would come caused Mr. Caro great anxiety.

24. Not only was Mr. Caro's father physically abusive towards Mr. Caro's mother, but he had an extramarital affair. The affair ended with Mr. Caro's father being shot in the chest by his mistress, which almost caused his death. Mr. Caro's older brother, Jose III, witnessed their father being shot. Upon being asked, Mr. Caro said when he was a child he knew of his father's unfaithful behavior, as did his mother.

25. When Mr. Caro's mother was angry at his father she would abandon her children in order to go out to dance. According to family members, Mr. Caro's mother neglected her children because she did not provide the attention her boys needed. Mr. Caro's mother was not the type of mother who would help him get ready for school, make sure he got to school, or help with his homework. When Mr. Caro was little he would get dressed the best way he could and walk to a family member's house to get something to eat before school. Mr.

Caro's aunt reported that, at nine-years-old, Mr. Caro could not tie his shoes or tell time.

26.  Mr. Caro struggled in school. Mr. Caro was given the Otis-Lennon Mental Abilities Test which yielded an IQ of 87 in the second grade, an 84 in fourth grade, and an 83 in 8th grade. According to his school records, when he was given the California Achievement Test in the sixth grade, he was functioning at a third grade level when it came to his vocabulary and comprehension. By sixth grade, Mr. Caro was placed in special education classes. He dropped out of high school before completing the tenth grade.

27.  Mr. Caro was 17-years-old at the time of his father's death, but when asked, he was unable to recall his age. According to reports from his aunt, Mr. Caro was in the hospital room at the time of his father's death. Mr. Caro has no specific memory of his father taking his last dying breath.

28.  Mr. Caro's mother passed away while he was incarcerated and he was unable to attend her funeral. He admitted to having one period of depression after the death of his mother. He stated he was "messed up" for a couple of months afterwards.

29.  I reviewed the trial testimony describing Mr. Caro's childhood family home as reported by Mr. Caro's three aunts and one cousin. I also reviewed the Time-line Narrative of Chronological Critical Incidents and Developmental History of Carlos Caro, which I have been told was prepared by the mitigation specialist before Mr. Caro's trial. While Mr. Caro's extended family members reported some of the traumatic events that occurred in Mr. Caro's family, witnesses such as Mr. Caro's brothers would have been able to describe the violence they each endured and/or witnessed in their childhood family home. They have been described as more verbal and social than Mr. Caro.

## Discussion of Diagnoses

30.  I have diagnosed Mr. Caro with Anxiety Disorder NOS (not otherwise specified), and determined that he meets some of the criteria for PTSD. As previously mentioned, Mr. Caro's family told prior counsel information which was consistent with symptoms of PTSD

such as his cousin describing Mr. Caro as being a reserved and quiet child who didn't volunteer information which is consistent with being avoidant; his maternal uncle Daniel noting that Mr. Caro stayed to himself and avoided groups; paternal aunts Delia and Veronica noting that Mr. Caro never talked to anyone. In addition, Mr. Caro's brother Noe stated that Mr. Caro liked to stay alone and be by himself.

31.   Individuals who suffer from PTSD often have constricted affect. This means that they do not outwardly express emotions with a full range. In other words, their outward expression of emotions does not reflect their inner feelings.  For example, when discussing the death of his mother, Mr. Caro remained reserved and reported feeling sad, but his outward expression of emotion did not reflect the sadness he reported.

32.   In Dr. Phillip's report Caro, he mentioned that Mr. Caro saw his father beat his mother up during his childhood, but Dr. Phillips never addressed the trauma and the effect it had on Mr. Caro. Dr. Phillips noted Mr. Caro's potential for violence should decrease based on actuarial scales but that Mr. Caro felt disrespected and retaliated against. One of the major symptoms of PTSD is that the individual often re-experiences the traumatic events. While Mr. Caro denies that he has recurrent intrusive thoughts about childhood events, he does avoid thinking about traumatic events. In a letter Mr. Caro wrote to his wife, he prayed that other inmates would "stay the fuck away from him," which is indicative of the avoidance symptom of PTSD.

33.   I have also diagnosed Mr. Caro with Cognitive Disorder NOS. He has problems with verbal fluency, short term memory, long term memory and reproducing a visuospatial design.

34.   Dr. Spica conducted a neuropsychological evaluation of Mr. Caro prior to his trial and reported frontal lobe dysfunction. Dr. Spica tested Mr. Caro in the 1st percentile on management of information, maintaining cognitive set and concept formation. Mr. Caro scored in the 1st percentile on the Wisconsin Card Sorting – Categories Achieved. He scored in the 7th percent in Booklet Category Test. Dr. Spica ultimately diagnosed him with Cognitive Disorder, Not Otherwise Specified. On his present mental status examination, Mr. Caro continues to demonstrate difficulties with frontal lobe functioning. Neuropsychological testing is a more sensitive method to

delineate brain functioning compared to mental status examination and neurological evaluation.

35.  On the Validity Indicator Profile (VIP) Dr. Spica found that Mr. Caro did not sustain consistent effort as the items got harder. He did poorly on Trails B which is another indicator of cognitive impairment.

36.  I have also diagnosed Mr. Caro with Adult Antisocial Behavior. In reaching this diagnosis, it should be noted that he only meets the criteria for adult antisocial behavior because his current conviction consists of an act that imposed physical or psychological harm on another person. Mr. Caro does not have a life-long history or childhood history of engaging in such aggressive behavior. This diagnosis is different from a diagnosis of Antisocial Personality Disorder. Adult Antisocial Behavior is another condition that is the focus of clinical attention but is not indicative of mental illness. To be clear, this diagnosis is not a personality disorder, and was incorrectly coded on Axis II by Dr. Phillips.

37.  Because Mr. Caro's mother is deceased, I did not have the opportunity to question her directly regarding her ability to parent her sons while dealing with a physically abusive alcoholic spouse. As discussed in paragraph 25 above, there are indications that Mr. Caro's mother was neglectful of her duties as a parent due, in part, to the abusive relationship she had with her husband. There is evidence that Mr. Caro failed to take initiative and respond to social interactions in an appropriate developmental way. He had symptoms of "frozen watchfulness," which is a lack of attachment that can be associated with pathological care. (DSM-TR p. 127). In other words, this behavior could be a direct result of his mother's neglect. His deficits may have also been indicative of a pervasive developmental disorder; however this is less likely since the symptoms of muteness and staring off into space have not persisted into adulthood.

38.  As Dr. Phillips noted in his report, Mr. Caro has had no criminal history prior to the age of 20 years old despite his siblings and other family members having strong histories of criminal activity.

39.  Mr. Caro also has a strong family history for substance abuse. Mr. Caro as well was a former substance abuser. I agree with Dr.

Phillips's diagnosis of Polysubstance Dependence By History. Mr. Caro presently denies using any substances since his confinement at Terre Haute.

40.    In general, Mr. Caro is a reserved individual who tends to avoid conflicts and unnecessary interactions with others, although he is able to adapt. He was reared in an environment where domestic violence was common, and he was a victim of domestic violence. There is no evidence that Mr. Caro has been a follower or a leader. He describes himself as a loner and demonstrates avoidant characteristics. Being avoidant is one of the symptoms of PTSD. Mr. Caro was raised in poverty and became involved in transporting drugs as a means of financial security. He also had a comorbid substance abuse, which is often associated with exposure to trauma.

41.    As a result of Mr. Caro's brain impairment and anxiety disorder likely arising from his traumatic history, he tends to become more increasingly anxious and unable to use all of the cognitive strategies available to him. His baseline cognitive impairments are further exacerbated by his anxiety disorder. What this means is that when Mr. Caro becomes anxious, he is more likely to exercise poor judgment.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 7th day of January 2013, in the State of South Carolina.

Donna Marie Schwartz-Watts, M.D.

Page 10 of 10

## Curriculum Vitae
### *DONNA MARIE SCHWARTZ-WATTS, M.D.*
donnawattsmd@gmail.com

**PRESENT POSITIONS:**

**Senior Psychiatrist (certified)**
Bryan Psychiatric Hospital

**DMH Clinical Professor of Psychiatry**
University of South Carolina School of Medicine
Department of Neuropsychiatry and Behavioral Science

**Clinical Professor, Forensic Psychiatry Program**
Medical University of South Carolina
Department of Psychiatry and Behavioral Sciences

**PROFESSIONAL LICENSURE:**

Diplomate, Psychiatry, (Board Certification #40726), January 1995,
recertified 7/05
Added Qualifications in Forensic Psychiatry, July 1996 #471, recertified 7/06
South Carolina Medical License # 16574

**EDUCATION:**

1981 - 1985       B.A. Psychology
Furman University
Greenville, South Carolina

1985 - 1989       Doctor of Medicine
University of South Carolina School of Medicine
Columbia, South Carolina

9/1995-5/1997            Forensic Residency Training Director
                        University of South Carolina School of Medicine

7 /1996 – 6/1997        Psychiatrist C   William S. Hall Psychiatric Institute
                        Residential Treatment Director of NGRI Unit

1/1995 – 6/1996         Teaching Psychiatrist II   William S. Hall Psychiatric Institute
                        Out-patient Forensic Psychiatrist

1/1995 – 12/1997        Assistant Professor University of South Carolina School of Medicine
                        Department of Neuropsychiatry

7/1994 –6/1995          Instructor University of South Carolina School of Medicine
                        Department of Neuropsychiatry

7/1994 – 12/1994        Teaching Psychiatrist I   William S. Hall Psychiatric Institute
                        In-patient and Out-patient Forensic Psychiatrist

## MEDICAL STAFF APPOINTMENTS:

Bryan Psychiatric Hospital (current)
South Carolina Department of Corrections (courtesy)
South Carolina Department of Juvenile Justice (inactive 7/2010)
William S. Hall Psychiatric Institute
Palmetto Health Richland Memorial Hospital (courtesy)
Palmetto Health Baptist Medical Center (courtesy)
Providence Hospital (pending)

## UNIVERSITY/ MEDICAL STAFF COMMITTEES:

2007-2010        Member, Appointments and Promotions Committee
2002- 2009       Member, Alumni Committee, USC School of Medicine
1996- 2010       Member, Residency Selection Committee
1995- 2010       Member, Residency Training Committee
2002- 2003       Member, Search Committee, Chairman of Neuropsychiatry
2000-2001        Member, Committee on Women USC
1997             Member, Traditions Committee USCSM
1997             Member, Search Committee, Director Rehabilitation Counseling
1997             Physician Advisor, Environment of Care
1996             Member, Search Committee Chair of Department of Neuropsychiatry and
                 Director of Hall Institute
1996             Member, Finance Committee, University Specialty Clinics
1994-1996        Member, Infection Control Committee
1993-1994        Member, Research Committee

3

Schwartz-Watts DM, Frierson RL: "20: Crisis Stabilization in Correctional Settings." in Clinical
Practice in Correctional Medicine , Second Edition, edited by Michael Puisis, D.O., S.C.
Mosby, Inc affiliate of Elsevier, Inc   2005.

Schwartz-Watts DM. "Asperger's Disorder and Murder." Analysis & Commentary   The Journal of
the American Academy of Psychiatry and the Law  33:390-3, 2005.

Schwartz-Watts DM, Rowell CN. "Commentary: Update on Assessing Risk for Violence Among
Stalkers." The Journal of the American Academy of Psychiatry and the Law  31:440-3, 2003.

Giorgi-Guarnieri D, Zonana HV, Schwartz-Watts DM. "Practice Guideline: Forensic Psychiatric
Evaluation of Defendants Raising the Insanity Defense." Supplement to The Journal of the
American Academy of Psychiatry and the Law   30:2, 2002.

Frierson R, Schwartz-Watts D, Malone T, Morgan D. "Capital Versus Noncapital Murderers" in
revision The Journal of the American Academy of Psychiatry and the Law, 1998.

Schwartz-Watts D, Morgan D. "Violent Versus Nonviolent Stalkers," accepted, The Journal of the
American Academy of Psychiatry and the Law, 1998.

Schwartz-Watts D, Morgan D, Barnes C. "Stalkers:  The South Carolina Experience,"  The Journal
of the American Academy of Psychiatry and the Law,1997, 24:541-545.

Schwartz-Watts D, Montgomery L, Morgan D. "Seroprevalence of Human Immunodeficiency Virus
Among Pre-Trial Detainees," The Bulletin of the American Academy of Psychiatry and the
Law, 1995, 23:285-289.

## POSTERS:

Internet Chat Rooms: Who Solicits Children? R. Gregg Dwyer, MD, EdD, Donna Schwartz-Watts MD ,
William Burke, PhD, American Academy of Psychiatry and the Law 39th Annual Meeting, Seattle, WA
October , 2008

## PRESENTATIONS:

"Predators Among Us" University of South Carolina 2012 Mini Med School, October 2, 2012,
Columbia, South Carolina

"How Death is Different-Using ABA Guidelines to Meet the Standard of Care in Death Penalty Cases
and Social History Investigations: The team Approach" with Joe VonKallist, Capital Case Workshop,
September 19, 2012, Wilmington, North Carolina

5

University of South Carolina School of Medicine Founder's Day Speaker for Woman in Medicine, Columbia, South Carolina, April 2007.

"Autistic Spectrum Disorders and Mitigation," Washington DC March 2007

"Sex Crimes and their Aftermath II" Panel Discussion and Presentation, Jack Swerling Moderator, South Carolina Bar Association Conference, Charleston, SC, January 25, 2007

"Psychiatry for the Brilliant Fact Finders" Invited Speaker, South Carolina Judges Conference, Greenville, SC,  May 12, 2006.

"Sex Crimes and their Aftermath" Panel Discussion and Presentation, Jack Swerling Moderator, South Carolina Bar Association Conference, Charleston, SC January 27, 2006.

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice National Institute of Trial Advocacy,  Atlanta Georgia , June 4-5, 2005

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice National Institute of Trial Advocacy,  Atlanta Georgia , June 5-6, 2004

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice National Institute of Trial Advocacy,  New York, New York, June 20-21,2003

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice, New York, New York. June 20-22,2002.

South Carolina Probation, Paroles and Pardons Annual Conference.  "A State of Mind". Myrtle Beach, SC. November 11, 2002.

American Academy of Psychiatry and the Law, "Difficult Case? Consult your Colleagues." Newport Beach, California. October 26, 2002

South Carolina Public Defender's Conference, "Issues and Concerns Regarding the Sexually Violent Predator Statue" Litchfield Beach, South Carolina, September 30, 2002

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice, New York, New York, June 28-30-2002.

American Academy of Psychiatry and the Law, "Death Penalty"  Boston, MA, October 28, 2001

American Academy of Psychiatry and the Law, "Ask the Expert" and "The Difficult Case" Panel Discussions.  Boston, MA, October 28, 2001

William S. Hall Psychiatric Institute Forensic Forum, 1996 "Evaluation and Treatment of Sexual Offenders."

Georgia Regional Forensic Forum, 1996 "Evaluation and Treatment of Sexual Offenders."

American Academy of Psychiatry and the Law, Seattle, Washington, 1995 "Stalkers: The South Carolina Experience"

South Carolina Psychiatric Association, Hilton Head Symposium, 1995 "What General Psychiatrists Need to Know About Forensic Psychiatry."

American Academy of Psychiatry and the Law Annual Conference, San Antonio, Texas   1993 "Seroprevalence of HIV Among Inpatient Pre-trial Detainees"

American Medical Association, North Carolina  1990 "Tertiary Metastases Presenting As Panhypopituitarism"

## PRESENT RESEARCH:

Schwartz-Watts D. "Death Penalty"

Schwartz-Watts D, Barth E, Morgan D. "Harassing Telephone Callers"

Schwartz-Watts D, Morgan D.  "Psychotic Versus Nonpsychotic Stalkers"

Schwartz-Watts D, Morgan D.  "Comparing Stalkers to the Criminally Domestic Violent."

Schwartz-Watts D, Bloom J, Sloan C.  "Psychiatric and Legal Perspectives of Stalking."

## PRESENT GRANTS:

Internet Crimes Against Children: Development of a Typology of Offenders for Use in Prevention, Investigations and Treatment; U.S. Department of Justice Office of Justice Programs Grant; 2010-MC-CX-003; Principle Investigator: RG Dwyer; Co-Principal Investigator: D DeHart; Co-Investigators/Consultants: R Moran, DM Schwartz-Watts, W Burke, DL Laufersweiler-Dwyer; 2010 - 2013

Internet Chat Room Solicitation of Children: A Study of Psychosocial and Criminal Justice Factors as They Relate to Public Safety Risk; American Academy of Psychiatry and the Law Institute for Education and Research (AIER) Grant; Principal Investigator: RG Dwyer; Co-investigators: D DeHart, DM Schwartz-Watts, W Burke & R Moran; 2009 - 2010

Co-author w Alicia Hall, PhD, Harry Wright, MD Autistic Spectrum Disorders and Corrections
(Revised 1/6/13)

9

# Exhibit 10

# Exhibit 10

## D.  M A L C O L M   S P I C A, PH. D.
### Licensed Clinical Psychologist
### Neuropsychologist

## NEUROPSYCHOLOGICAL CONSULTATION

| | |
|---|---|
| Examinee: | **Carlos David CARO** |
| Laboratory Number: | 264841 |
| Age: | 39 |
| Date of Birth: | 2/9/1967 |
| Handedness: | Right |
| Education: | 9° |
| Date of Examination: | 6/9/06; 6/16/06 |
| Examiner: | D. Malcolm Spica, Ph.D. |

REFERRAL QUESTION:

Mr. Carlos David Caro is a 39-year-old, right-handed male referred for neuropsychological examination by attorneys Stephen Kalista and Jim Simmons. Attorneys Kalista and Simmons asked that I assess Mr. Caro's neurobehavioral status. This assessment is intended to serve as a contributing component to the broader evaluation of Mr. Caro's psychiatric, developmental, and adaptive functioning being conducted by Mr. Caro's defense team.

Mr. Caro is completing the evaluation at the request of his attorneys. No doctor/patient relationship was established, nor were there any expectations or guarantees of future contact or relationship. The limits of confidentiality were explained to Mr. Caro, and he stated that he understood those limits and consented to complete the testing. All testing and interviewing was conducted with the examinee at the United States Penitentiary - Lee in Jonesville, Virginia.

HISTORICAL INFORMATION:

In preparation for the evaluation, I reviewed Mr. Caro's medical record provided by attorney Kalista's office. Mr. Caro's history is summarized by other examiners, and will not be repeated here. On the days of the examination, Mr. Caro reported that he was in good health, adequately rested, and adequately fed. He stated that he is taking no medications.

He stated that he is not experiencing insomnia. Mr. Caro's appetite is reportedly normal. When asked about his mood, he stated, "It's good." He stated that he has not suffered any significant head injuries of which he was aware. He reported no history of serious illness, losses of consciousness, prolonged high fevers, seizures, or sensory disturbances. He reported that his family history is significant for diabetes in his mother, brother, and maternal uncle. Mr. Caro reported that he was a "sickly" child, but had trouble elaborating other than he was told that he was 'slow' to develop. He also reported that he "might have" had difficulty with developmental milestones; when asked at what age he learned to walk and talk, he stated, "I think it was a little later." When asked at what age he learned to tie his shoes, he stated, "That was later."

Mr. Caro stated that he spoke both English and Spanish in his home of origin. He was educated in English. He stated that he had no learning problems during his development: however, the record reflects that Mr. Caro demonstrated significant problems in spelling and writing since the first grade. Likewise,

---

RE: Carlos David CARO, page 2

his performances in courses such as geography were problematic since the fourth grade. Conversely, he obtained mainly A and B grades in arithmetic. During the fourth grade, an Otis-Lennon Mental Abilities test yielded an intelligence quotient of 84 (14th percentile). A Gates-MacGinitie reading test administered during the fourth grade yielded a 2.3 grade equivalent comprehension score. Achievement testing (California Achievement Test) during the sixth grade yielded scores at the 3rd grade equivalent for vocabulary and comprehension. Language mechanics and expression scales yielded grade equivalent scores of 2.6 and 2.7, respectively. Mathematics continued to be his strength. Achievement testing during the seventh grade yielded a mathematics grade equivalent score of 6.0. Overall, Mr. Caro's academic record reflects long-standing difficulties in linguistic abilities, while his arithmetic skill is within normal limits. Mr. Caro reported to me that he dropped out of school after the ninth grade. When asked why he dropped out, he stated, "I don't know."

Mr. Caro's occupational history reportedly includes, "I worked a little here and there." He stated that he delivered appliances for approximately one year, and that his favorite job was working in an automotive paint and body shop, where he was employed "a couple of months, on and off." Please refer to the examinee's extensive documentation for a more complete account of his history.

BEHAVIORAL OBSERVATIONS:

Mr. Caro presented as an adequately-groomed man in his United States Penitentiary - Lee uniform, and he appeared his age. Hygiene appeared adequate. Mood appeared generally euthymic with a broad range of appropriate affect. Spontaneous speech was normal in tone and prosody (with relatively low volume), and receptive language abilities appeared intact. The examinee's eye contact was initially minimal, although he appeared to engage more with the examiner as the testing sessions continued. Mr. Caro rarely spoke, aside from answering direct questions. Mr. Caro's interpersonal behavior --with shy and polite manner-- was highly consistent between both testing sessions.

Mr. Caro appeared to engage easily with me, and displayed a cooperative and considerate attitude (e.g., returned tests stimuli to my side of the table to assist me, listened to all instructions before beginning tasks, etc.). He did not decline to answer any questions and he worked without complaint during the testing sessions. He appeared to give his best effort on all tasks. The findings are considered a valid measure of his current cognitive/adaptive abilities.

EXAMINATION FINDINGS:

The face-to-face testing was conducted during one 4-hour session (6/9/06) and one 3.5-hour session (6/16/06). During the course of the examination, the following tests and procedures were administered:

21-Item Word Memory Test
Beck Anxiety Inventory
Beck Depression Inventory-II
Benton Facial Recognition Test
Boston Diagnostic Aphasia Examination: Commands; Complex Ideational Material
California Verbal Learning Test - II
Category Fluency Test
Controlled Oral Word Association Test
Finger Tapping Test
Grooved Pegboard Test
Halstead-Reitan Booklet Category Test
Judgment of Line Orientation Test
Nelson-Denny Reading Test
Repeatable Battery for the Assessment of Neuropsychological Status
Rey-Osterrieth Complex Figure Test
Ruff Figural Fluency Test

Symptom Checklist-90-Revised
Test of Memory Malingering
Trailmaking Test A & B
Wechsler Adult Intelligence Scale-III
Wechsler Test of Adult Reading
Wide Range Achievement Test-3
Wisconsin Card Sorting Test
Woodcock-Johnson Psychoeducational Battery: Analysis-Synthesis, Concept Formation

Validity/Motivation:  Considering the Mr. Caro's bilingual background, his comprehension of English was assessed.  His vocabulary score on the Nelson-Denny Reading Test ranked in the upper half of the Average range (64th percentile).  Mr. Caro's vocabulary score on the WAIS-III was also Average (25th percentile).  He provided perfect performances on comprehension subtests of the Boston Diagnostic Aphasia Examination: Commands = 15/15; Complex Ideational Material = 12/12.  These scores suggest that language barriers did not hinder Mr. Caro's performances on the current examination.

Mr. Caro was administered both verbal and visual tests of validity/effort (one on each day of the testing sessions).  He did not appear to withhold effort during his evaluation.  Further, his performance of 14/21 on the 21-Item Word Test - Forced Recall ranked well within normal limits.  Likewise, Mr. Caro provided a perfect performance on the Test of Memory Malingering:

Trial 1    = 50/50
Trial 2    = 50/50
Retention = 50/50

Both symptom validity measures suggested Mr. Caro did not engage in impression management, symptom exaggeration, or other dissimulation efforts.

General Cognitive Functioning:  Mr. Caro was administered the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) as a general measure of cognitive functioning.  His Total Index of 75 ranked in the Borderline-Impaired range for overall neurocognitive function.  This score places him below 95% of the general population for overall cognitive/adaptive functioning.

| Index | Standard Score | Percentile |
|---|---|---|
| Immediate Memory | 83 | 13th |
| Visuospatial/Constructional | 72 | 3rd |
| Language | 87 | 19th |
| Attention | 75 | 5th |
| Delayed Memory | 83 | 13th |
| Total | 75 | 5th |

This Total Index score compares unfavorably to statistical premorbid estimates that place Mr. Caro in the Average range: for example, his performance on the Wechsler Test of Adult Reading provided Predicted Full Scale IQ = 90 (25th percentile).  Similarly, Mr. Caro's Barona Formula Premorbid IQ Estimate ranked in the Low Average range: Premorbid Full Scale IQ = 83 (13th percentile).  However, considering the examinee's complex history of maladaptive behavior, it appears probable that these performances reflect long-standing deficits (rather than implicating a dementing process).

Intellectual Functioning:  To further assess cognitive functioning, Mr. Caro was administered the Wechsler Adult Intelligence Scale-III (WAIS-III).  Mr. Caro performed at the lower extreme of the Average range for overall intellectual functioning (Full Scale IQ = 91) with particular weaknesses in verbal processing (Verbal IQ = 87) ranking below 81% of the general population.

RE: Carlos David CARO, page 4

Full Scale IQ = 91            Verbal IQ = 87            Performance IQ = 98

| Subtest | Age Scale | Percentile | Subtest | Age Scale | Percentile |
|---|---|---|---|---|---|
| Information | 8 | 25th | Picture Completion | 11 | 63rd |
| Digit Span | 8 | 25th | Picture Arrangement | 7 | 16th |
| Vocabulary | 8 | 25th | Block Design | 11 | 63rd |
| Arithmetic | 8 | 25th | Digit Symbol | 11 | 63rd |
| Comprehension | 8 | 25th | Matrix Reasoning | 9 | 37th |
| Similarities | 7 | 16th | Symbol Search | 10 | 50th |
| Letter-Number Sequencing | 5 | 5th | | | |

Academic Skills: The examinee demonstrated spelling abilities at the 5th grade level on the Wide Range Achievement Test-3 (3rd percentile). Word recognition skills appeared in the Low Average range (21st percentile; high school level), and written arithmetic ranked at the 6th grade level (7th percentile; Borderline-Impaired).

Testing of reading proficiency revealed that the examinee is average for reading speed: Nelson Denny Reading Test - Rate, 39th percentile. Mr. Caro comprehended the material to a 5th grade level (10th percentile).

Attention and Executive Functioning: The examinee appeared alert throughout both testing sessions. He performed in the Low Average range on the Attention Index of the Wechsler Memory Scale-Revised; Standard Score = 83, 13th percentile. Visual scanning was Average: Trail Making Test-A 70th percentile; visual scanning combined with mental tracking was also Average: Trail Making Test - B, 32nd percentile.

During the WAIS-III, Mr. Caro demonstrated difficulty with the neuropsychological domain of executive functioning; he had difficulty organizing information he attempted to encode or express. This lack of organization or strategy resulted in relative weaknesses on tasks of working memory or processing that required mental organization: e.g., Working Memory Index = 82, 12th percentile. The examinee exhibited difficulty using social conventions to sequence pictorial stimuli in temporal order (Picture Arrangement, 16th percentile). Sequencing difficulties were found also in the verbal domain: Letter-Number Sequencing, 5th percentile. Such sequencing functions are believed to be mediated by the frontal territories of the cerebral cortex.

Additional signs of executive control dysfunction were seen on multiple tasks. For example, the examinee performed in the severely impaired range on a task requiring hypothesis testing and mental organization to solve a complex problem: Wisconsin Card Sorting Test-Categories Achieved, 1st percentile. During this task, Mr. Caro frequently lost track of his own method for solving the problem: Failure to Maintain Set, <1st percentile.

Higher-Order Reasoning: On the relatively unstructured Halstead-Reitan Booklet Category Test, Mr. Caro exhibited deficient concept formation abilities (73 errors; 7th percentile). He appeared to feel pressured during this task, and he exhibited increasing discomfort as he repeatedly made errors (and was provided corrective feedback). Overall, it appears that his abstract reasoning abilities are variable, depending on his level of distress while attempting a task. He actually performed within the Low Average range on a separate task of abstract reasoning that required only brief responses: Similarities, 16th percentile.

On additional tasks of higher-order reasoning, Mr. Caro again exhibited deficits. He performed at the second-grade level on the Analysis-Synthesis subtest of the Woodcock-Johnson Psychoeducational Battery; this performance corresponds to an age equivalent of 8 years old. Similarly, on the Concept

Formation subtest, which also requires higher order reasoning, the examinee performed at the level of a 14-year-old (9.2 grade equivalent). His Fluid Reasoning Index ultimately ranked at the 5.2-grade level, comparable to a person 10 years old.

Overall, it appears most accurate to describe Mr. Caro's judgment and reasoning abilities as unstable. Such instability of judgment/reasoning is often associated with frontal cerebral lobe dysfunction.

Language Functioning: Mr. Caro's vocabulary ranked in the average range: Nelson-Denny Reading Test, 64th percentile WAIS-III Vocabulary, 25th percentile. Expressive language abilities also ranked in the average range: e.g., WAIS-III Comprehension, 25th percentile. His semantic access abilities for generating words within a semantic category (i.e., exemplars of animals) ranked in the Average range: Category Fluency Test, 33rd percentile. However, verbal fluency for generating words within phonemic categories (i.e., beginning with a specified letter) ranked in the impaired range: Controlled Oral Word Association Test, 3rd percentile. This pattern of performance (phonemic fluency inferior to semantic fluency) is typically associated with frontal lobe dysfunction. Frontal lobe dysfunction could also account for the examinee's instability of concept-formation/reasoning skill, noted above.

The fact that Mr. Caro exhibited relatively normal verbal expression skills (e.g. Verbal Comprehension Index, 21st percentile) raises the probability that persons engaging in casual conversation with the examinee will overestimate his level of cognitive functioning. That is, simple discourse with Mr. Caro is likely to tap only his strengths, and may not reveal his deficits in executive functioning, reasoning, or his problems with discriminating information (a deficit described below).

Sensory-Motor Functioning: Mr. Caro reported being right-handed. Simple repetitive motor speed was normal, bilaterally: Finger Tapping-right hand, 58th percentile; left hand, 37th percentile. Mr. Caro also provided normal scores with each hand on a task requiring fine motor dexterity for placing pegs into a board: Grooved Pegboard Test-right hand, 20th percentile; left hand, 63rd percentile.

Visuoanalytic Functioning: The examinee demonstrated normal abilities for interpreting spatial relations in visual stimuli. For example, he performed in the average range on a test requiring recognition of faces portrayed in photographs: Benton Facial Recognition Test, 45/54. With more simplistic stimuli, he performed well within normal limits (e.g., Judgment of Line Orientation Test, 56th percentile). His visual spatial skills again appeared intact during subtest of the WAIS-III: Perceptual Organization Index = 101, 53rd percentile.

Memory and Learning Functioning: As noted above, Mr. Caro performed in the Low Average range on the Immediate Memory Index of the Repeatable Battery for the Assessment of Neuropsychological Status: Standard Score = 83, 13th percentile. The examinee's recall of the material after a delay also ranked in the Low Average range: Delayed Memory Index = 83, 13th percentile.

Mr. Caro was also administered the Wechsler Memory Scale-Revised. He demonstrated a disparity between his verbal and visual skills: Verbal Memory Index = 75, 5th percentile vs. Visual Memory Index = 114, 83rd percentile. During this task, Mr. Caro exhibited disorganization in his approach to memorizing the verbal material: e.g. Verbal Paired Associates, 3rd percentile (impaired). The examinee appeared to lack structure or method in his approach to encoding the material. This was less apparent on tasks involving visual material, as the requirement for mental organization was lower: e.g., Visual Paired Associates, 63rd percentile.

Verbal learning abilities were assessed additionally with the California Verbal Learning Test-II, which places demands on independent organization of encoding and retrieval strategies when dealing with a large amount of verbal material. During this task, the examinee demonstrated a deficit in discriminating between actual target words to which he had been exposed and plausible alternatives. Mr. Caro exhibited a problematic response bias in that he endorsed most material presented to him as seeming familiar. Consequently, he performed in the severely impaired range when asked to decide whether or not he had previously heard, and

was asked to memorize, individual words in a list (when he had been exposed to only a subset of the words previously): Response Bias, 2nd percentile. This deficit is likely impairing in the examinee's daily life, as it makes him highly suggestible, believing that information presented to him is familiar. He likely has difficulty discriminating between actual facts and information that is close but distorted.

<u>Psychological/Mood Status</u>: Mr. Caro reported no problems with mood, or vegetative signs of mood disruption (such as sleep or appetite disturbance). He was administered multiple scales of mood status. According to his responses, he ranked in the normal range for depression (e.g., Beck Depression Inventory-II, 4/63) and anxiety (e.g., Beck Anxiety Inventory, 0/63).

To assess a broader range of symptomology, Mr. Caro was also administered the quantitative Symptom Checklist-90-Revised. He endorsed no items, yielding to normal scores on every scale:

| Scale | Raw Score |
| --- | --- |
| Somatization | 0 |
| Obsessive-Compulsive | 0 |
| Interpersonal Sensitivity | 0 |
| Depression | 0 |
| Anxiety | 0 |
| Paranoid Ideation | 0 |
| Psychoticism | 0 |

On interview, the examinee denied psychotic features such as hallucinations, delusions, or ideas of reference.

## SUMMARY & CONCLUSIONS:

This 39-year-old man participated in a comprehensive neuropsychological examination to evaluate his neurobehavioral status. This assessment is intended to serve as a contributing component to the broader evaluation of Mr. Caro's psychiatric, developmental, and adaptive functioning being conducted by his defense team. Formal symptom validity/effort measures indicated that Mr. Caro provided his full effort on the neuropsychological measures and did not engage in symptom exaggeration, impression management, or other dissimulation.

The neuropsychological test results revealed converging signs of frontal lobe dysfunction. He performed as low as the 1st percentile on tasks requiring:
- Management of information
- Maintaining cognitive set
- Concept formation

His difficulty with managing information causes him to mistake actual information to which he has been exposed and plausible alternatives. This deficit is likely impairing in Mr. Caro's daily life, as it makes him highly suggestible, believing that information presented to him is familiar. He likely has difficulty discriminating between actual facts and information that is close but distorted.

His problems with maintaining cognitive set limit his ability to learn from his mistakes (gaining from experience). Mr. Caro appears to easily lose track of what he's doing and misunderstand why his behavior results in a certain outcome. For example, while attempting a task requiring him to sort cards according to an over arching rule, he repeatedly lost track of the rule (e.g., sorting by color) and was puzzled by the feedback that he was getting items wrong: Wisconsin Card Sorting Test - Categories Achieved, 1st percentile.

Persons with frontal lobe dysfunction tend to respond impulsively, without planning, and without proper consideration of competing information. Mr. Caro's difficulty with concept formation (Booklet Category Test, 7th percentile) results in poor understanding of cause-and-effect relationships.

Each of the above three neurocognitive activities fall under the general domain of Executive Control. Executive control has been found to be mediated by the cerebral frontal lobes throughout neuropsychological scientific literature. From my understanding of Mr. Caro's history, his frontal lobe dysfunction is likely life-long in nature; he reportedly demonstrated failure to thrive as an infant, and developmental milestone difficulties (e.g., speech fluency and motor programming such as tying his shoes), and he has had no clear cerebral insults later in life (e.g., no major head injuries).

Please note that these findings of frontal lobe dysfunction are not easily explained by external issues such as effort or mood disruption, as Mr. Caro demonstrated strong effort on formal symptom validity testing and ranked well within the normal range on tests of mood status.

During the current examination, Mr. Caro demonstrated verbal expressive abilities within normal limits. While these skills are likely beneficial to Mr. Caro, they may also cause persons who only interact with him verbally to overestimate his cognitive abilities.

I speculate that the cognitive deficits that cause the greatest maladjustment in the examinee's daily life are:
   a)  instability of reasoning (disordered thinking when under pressure)
   b)  deficits in discriminating between actual information and distorted approximations

Mr. Caro appears to be a man of only modest internal/intellectual resources, with unreliable judgment skills, and an inability to sort through information provided to him. His objective test scores revealed that his reasoning ability under calm, controlled conditions ranks at the level of a 10-year-old; when under pressure he performed much lower (impaired range). The examinee is likely easily overwhelmed by multiple sources of information, ambiguous signals, and any perceived pressure/threat.

DIAGNOSTIC IMPRESSION:

   Cognitive Disorder-NOS: see list above (DSM-IV Code 294.9)

RECOMMENDATIONS:

Considering the findings of cerebral frontal lobe dysfunction noted above, I recommend consultation with a forensic psychiatrist to integrate these findings with an assessment of Mr. Caro's psychiatric, neurocognitive, and adaptive functioning relative to the facts and legal issues regarding Mr. Caro's current criminal charges. I have found forensic psychiatrist Keith Caruso, M.D. to be particularly helpful in this regard (615-236-1119; 9005 Overlook Boulevard, Brentwood, TN 37027). Please feel free to contact me if I can further facilitate a referral.

It was a pleasure working with this examinee. If I can be of any further assistance to Mr. Caro, please do not hesitate to contact me.

D. Malcolm Spica, Ph.D.
Licensed Clinical Psychologist

# EXHIBIT 61

# EXHIBIT 61

# Pupil's Cumulative Record — Elementary School

FORM NO. 3669

Case 2:03-cr-10115-JPJ   Document 196-1   Filed 02/20/13   Page 60 of 72   Page ID # 484

| | (Last Name) | (First) | (Middle) | Birthplace Country or U. S. State | Race | Speaks English | Education | Occupation of Parents or Guardian |
|---|---|---|---|---|---|---|---|---|
| PUPIL | Caro, Carlos David | | | | | | | |
| FATHER | Caro, Jose Maria Jr. | | | | | | | Johnson Tool |
| MOTHER | Caro, Virginia Rodriguez | | | | | | | |
| LEGAL GUARDIAN | | | | | | | | |

Birthdate.... 2 .. Mo. .. 9 .. Day ,19 67 Year

Birthdate Based on:

Age at Entrance.......... Years ...... Mos.

School Last Attended:

## RECORD OF ATTENDANCE, SCHOLARSHIP, AND RESIDENCE

Previous Record:

| School Year | Semester Ending | Date of Entrance | Grade | Days Absent | Days Times Tardy Present | Language | Spanish | Literature | Reading | Spelling | Writing | Citizenship | Government | History | Geography | Agriculture | Homemaking | Shop Work | Physical Ed. | Health | Music | Art or Drawing | Arithmetic | Gen. Math. | Science | | | Effort | Study Habits | Retained or Promoted to | Withdrawn Date and Reason | Name of Teacher | School or Building | County, Parish or City | Residence Street Name and Number or District Number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 72-73 | 1-12-73 | 8-21-72 | K | 4 | 87 | N | | | | | | N | | | | | | | S | S | S | S | N | | | | | N | | | | Edna E. Balderas | Lasater | Brooks | 603 Palo Blanco |
| 73 | 5-23-73 | | K | 2 | 86 | S | | | | | | N | | | | | | | S | S | S | S | N | | | | | N | | P | | Edna E. Balderas | Lasater | Brooks | |
| 1973 | 1-17 | 8-27 | 1 | 13 | 78 | D | | | C | D | C | B | | | | | | | ✓ | ✓ | ✓ | ✓ | B | | ✓ | | | | | | | Juanita Ayers | " | " | " |
| 1974 | 5-29 | | 1 | 4 | 85 | S | D | | 65 | C | C | | | | | | | | ✓ | ✓ | ✓ | ✓ | B | | ✓ | | | | | P-2 | | Juanita Ayers | " | " | " |
| 75 | 1-16 | 8-22 | 2 | 1 | 89 | D | | | D | D | C | B | | | | | | | ✓ | ✓ | ✓ | ✓ | D | | ✓ | | | | | | | Fidela Trevino | " | " | 603 Palo Blanco |
| | 5-28 | | | 1 | 89 | D | | | D | D | C | C | | | | | | | ✓ | ✓ | ✓ | ✓ | C | | ✓ | | | | | 3rd. | | Fidela Trevino | " | " | " |
| 75-76 | 11-14-75 | 8-21 | 3 | 0 | 60 | B | | | C | B | C | B | C | | | | | | ✓ | ✓ | ✓ | ✓ | A | | ✓ | | | | | | | J. Cunningham | F.E. | " | " |
| 75-76 | 2-24-76 | | 3 | 0 | 60 | C | | | B | D | C | B | C | | | | | | ✓ | ✓ | ✓ | ✓ | A | | ✓ | | | | | | | " " | " " | " " | " " |
| 75-76 | 5-27-76 | | 3 | 2 | 58 | C | | | B | B | C | C | B | | | | | | ✓ | ✓ | ✓ | ✓ | B | | ✓ | | | | | P-4 | | " " | " " | " " | " " |
| 76-77 | 11-12 | 8-19 | 4 | 0 | 60 | C | | | D | D | C | B | D | | | | | | ✓ | ✓ | ✓ | ✓ | B | | ✓ | | | | | | | Mary L. Salinas | " " | " " | " " |
| 76-77 | 2-24 | 11-16 | 4 | 4 | 56 | C | | | C | D | C | B | D | | | | | | ✓ | ✓ | ✓ | ✓ | | | ✓ | | | | | | | " " | " " | " " | " " |
| 977 | 5-25 | | 4 | 2 | 56 | C | | | B | D | C | B | D | | | | | | ✓ | ✓ | ✓ | ✓ | B | | ✓ | | | | | P.5 | | Mary L. Salinas | " " | " " | " " |

COMMENTS ON HOME AND FAMILY

COMMENTS ON BEHAVIOR OR SOCIAL ADJUSTMENT

Grade            Grade            Grade            Grade            Grade            Grade

Elementary School Record (Continued)

Page 60 of 436

DATE OF BIRTH  2-9-67                                                                 TELEPHONE NO. (In Pencil)

| | | EDUCATIONAL TEST RECORD | | | | GROWTH, HEALTH, AND IMMUNIZATION RECORD | | | |
|---|---|---|---|---|---|---|---|---|---|
| Grade | Age | Name of Test | Score | T. A.* | Remarks | Date | Hgt. | Wgt. | Notes on Health, Diseases, and Vaccination |
| K | | Mt. Read. Form B (4-73) | 28 | | Little Rating D | | | | |
| 1 | | Gates Mac Ginitie Read Primary A Form I (4-74) | | | Voc. 1.3  Comp. 1.3 | | | | |
| | | Gates Mac Ginitie Read. Prim B Form 2 | (4-75) | | Voc. 1.4  Comp. 1.4 | | | | |
| 2 | | Otis Lennon Mental Ability Test Elem. 1 Form K | (2-75) | | I.Q 81 | | | | |
| 2 | | Met. Achieve. Test Prim. 2 | (3-75) | | R.E. 1.8 | | | | |
| 3 | | Gates-Mac Ginitie Read. Prim C Form I | 4-76 | | Voc. 2.6  Comp. 2.4 | | | | |

*T. A. = Test Age; the Score in Chronological Age, Mental Age, or Achievement Age.  Use %ile if preferred.

| | | RECORD OF SPECIAL EDUCATION AND PHYSICAL DEFECTS | | | Grade | Interests, Distinctions, and Memberships |
|---|---|---|---|---|---|---|
| Grade | *Item | Condition | Action Taken | Year-End Results | | |
| | | | | | | |

| Date | Final Recommendation and Comments |
|---|---|

*1. Deficient Vision  2. Deficient Hearing  3. Orthopedic Handicaps  4. Speech Disorders  5. Lowered Vitality  6. Nervous Disorders  7. Teeth  8. Lungs
9. Tonsils  10. Adenoids  11. Skin  12. Feet  13. Posture  14. Heart  15. Mentally Retarded  16.        17.

(Position)

Signed by:

Parental Survey of Home Language
Falfurrias Elementary School

Dear Parent(s)/Guardian(s):

Recently the Supreme Court ruled in the Lau vs. Nichols decision that schools must report what language(s) is spoken by children and their families in their home. Clearly you are most qualified to provide us with this information. By sharing this important information with us, you will help us provide the best education for your children attending our schools.

Your participation is very important. Please take the time to answer several questions about the language(s) spoken in your home. With your help, we can work together to give your children the very best that our schools can offer.

Please answer the questions on this questionnaire and return to your children's teacher. Do not hesitate to call the school if you have any questions. Once again, we deeply appreciate your cooperation in helping us to provide a better education for your children.

Please check only ONE category which best describes your children's racial/ethnic background.

_____ BLACK (Black, Negro, Afro-American, African descent, Trinidadian, Jamaican, West Indian)

_____ ASIAN (Asian-American, Japanese, Chinese or Korean descent)

___✓___ SPANISH ORIGIN/LATINO (Chicano, Mexican, Puerto Rican, Latin American or Spanish descent)

_____ NATIVE AMERICAN (American Indian)

_____ WHITE (White, Anglo, Pakistani, East Indian, European descent)

_____ FILIPINO (Filipino-American, Filipino descent)

_____ OTHER (Aleut, Eskimo, Malayan, Thai, other nonwhite not specified above)

_____ INDOCHINESE (Vietnamese, Cambodian, Laotian)

_____ DECLINE TO STATE

1. Student's name: Caro, Carla O          Grade 5   Teacher _Silherica_
   Last name, First name, Initial

2. Father's full name: Caro, Juan
   Last          First          Initial

3. Mother's full name: Caro, Villanua
   Last          First          Initial

4. Does your child have the advantage of hearing a language other than English spoken when he is not in school? Yes _✓_   No _____

5. If so, which language? Spanish

6. Does he hear the language:

   _✓_ most of the time?
   ___ some of the time?
   ___ not very often?

7. Is the other language spoken by:

   _✓_ Father          ___ other
   _✓_ Mother          specify _____
   ___ Grandparent(s)

8. When another language is spoken, does your child:

   _✓_ Understand most of what is said?
   ___ Understand some of what is said?
   ___ Understand very little of what is said?

9. Does your child speak the other language:

   _✓_ most of the time?
   ___ some of the time?
   ___ not very often?
   ___ Never?

10. If the answer to No. 4 is "No", would you be interested in having a second language taught to your children as part of the school studies? Yes _____   No _____
    If "Yes", which language? _____          603 Palo Blanco

Parents were contacted but child still did not bring survey form. _____

New Caro Hill Transferred
Jose Caro 7th ____

# Student's Cumulative Record — Grades 7-12

| NAME OF | Boy Girl | (Last Name) | (First) | (Middle) | Birthplace Country or U.S. State | Speaks English | Education | Occupation of Parents or Guardian | Birthdate _____ , 19___ | Identification Picture, Fingerprint, or Description |
|---|---|---|---|---|---|---|---|---|---|---|
| | STUDENT | | | | | | | | Birthdate Based on: | Color Eyes |
| | FATHER | | | | | | | | Age at Entrance: | Color Hair |
| | MOTHER | | | | | | | | Previous School Record: | Other: |
| | LEGAL GUARDIAN | | | | | | | | | |

## RECORD OF ATTENDANCE, SCHOLARSHIP, AND RESIDENCE

| 7TH GRADE SUBJECTS | Year Studied | 1st | 2nd | 3rd | 4th | Average |
|---|---|---|---|---|---|---|
| Language Arts *Resource* | 79-80 | 50 | 71 | | | 61 |
| Social Studies | | 36 | 31 | | | 34 |
| Mathematics | | 46 | 50 | | | 48 |
| Science | | 57 | 63 | | | 60 |
| *Reading* | | 72 | 70 | | | 71 |
| *Choir* | | 83 | 84 | | | 84 |
| *APE* | | 95 | 77 | | | 86 |
| *Citizenship* | | 81 | 85 | | | 83 |
| *P-8* | | | | | | |

| 8TH GRADE SUBJECTS | Year Studied | 1st | 2nd | 3rd | 4th | Average |
|---|---|---|---|---|---|---|
| Language Arts | 80-81 | 72 | 50 | | | 50 |
| Social Studies *Resource* | | 86 | 83 | | | 85 |
| Mathematics | | 58 | 62 | | | 60 |
| Science | | 62 | 45 | | | 54 |
| *Comp. Reading* | | 54 | 76 | | | 65 |
| *Shop* | | 69 | 68 | | | 69 |
| *Choir* | | 77 | 78 | | | 78 |
| *Citizenship* | | 87 | 85 | | | 86 |
| *P-9* | | | | | | |

| 9TH GRADE SUBJECTS | Year Studied | No. Weeks Studied | No. Periods per Week | Minutes per Period | 1st | 2nd | 3rd | 4th | Average | Units Earned |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| 10TH GRADE SUBJECTS | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| 11TH GRADE SUBJECTS | Year Studied | No. Weeks Studied | No. Periods per Week | Minutes per Period | 1st | 2nd | 3rd | 4th | Average | Units Earned |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |

| 12TH GRADE SUBJECTS | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

### COMMENTS ON STUDENT'S DEVELOPMENT

| Year | School | City or County | Student's Address | Date of Entrance | Cause if Late | Days Present | Days Absent | Times Tardy | Date and Reason for Withdrawal |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Total Credits Required for Graduation_____ Date of Graduation_____ Transcript sent to_____

Case 2:03-cr-10115-JPJ   Document 196-1   Filed 02/20/13   Page 63 of 72   Pageid#: 487

# Student's Cumulative Record — Grades K-6

Reorder Form 7103-12 • Steck-Vaughn Company

| NAME OF | | (Last Name) | (First) | (Middle) | Birthplace Country or U.S. State | Speaks English | Education | Occupation of Parents or Guardian | Birthdate |
|---|---|---|---|---|---|---|---|---|---|
| | Boy Girl | | | | | | | | Birthdate B |
| | STUDENT | | | | | | | | Age at Entr |
| | FATHER | | | | | | | | School Last |
| | MOTHER | | | | | | | | |
| | LEGAL GUARDIAN | | | | | | | | |

## RECORD OF ATTENDANCE, SCHOLARSHIP, AND RESIDENCE

| Grade | School Year | Term Ending | Date of Entrance | Grade | Days Present | Days Absent | Times Tardy | Language | Spanish | Literature | Reading | Spelling | Writing | Citizenship | Government | History | Geography | Agriculture | Homemaking | Shop Work | Physical Ed. | Health | Music | Art or Drawing | Arithmetic-Mathematics | Science | E Resource | Study Habits | Comp. Reading | Retained or Promoted to | Withdrawn Date and Reason | Name of Teacher | School or Building | City | Street Name and Number or District Number |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| K | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 4 | 76-77 | 11-12 | 8-14 | 4 | 60 | | | C | | D | D | C | B | | | D | | | | | ✓ | ✓ | ✓ | ✓ | B | ✓ | | | | | | M. L. Salinas | | | |
| | 1977 | 2-24 | | | 56 | 4 | | C | | C | D | C | B | | | D | | | | | ✓ | ✓ | ✓ | ✓ | C | ✓ | | | | | | '' '' '' | | | |
| | 1977 | 5-26 | | 4 | 56 | 2 | | C | | B | D | C | B | | | D | | | | | ✓ | ✓ | ✓ | ✓ | B | ✓ | | | 5 | | M. L. Salinas | | | |
| 5 | 77-78 | 11-11 | 8-22 | 5 | 54 | 3 | | C | | C | D | C | A | | | F | | | | | ✓ | ✓ | ✓ | ✓ | C | ✓ | | | | | J. A. Silberisen | | | |
| | 78 | 2/24 | — | 5 | 53 | 6 | | B | | C | F | C | B | | | F | | | | | ✓ | ✓ | ✓ | ✓ | B | ✓ | | | | | '' '' | | | |
| | 78 | 5/24 | — | 5 | 56 | 3 | | F | | D | D | C | A | | | F | | | | | ✓ | ✓ | ✓ | ✓ | C | ✓ | | | P-6 | | '' '' | | | |
| 6 | 78-79 | 5-24 | 8-28 | 6 | 169 | 10 | | 83 | | 66 | | | 83 | | | | | | | | 90 | 73 | 73 | 64 | | 94 | | 79 | P-7 | | | | | |

| COMMENTS ON HOME, FAMILY, BEHAVIOR, AND SOCIAL ADJUSTMENTS | Kindergarten | Grade 1 | Grade 2 | Grade 3 | Grade 4 | Grade 5 | Grade 6 |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

**Cumulative Record—Grades K-6 (continued)**

DATE OF BIRTH | TELEPHONE NO. (In Pencil)

| | EDUCATIONAL TEST RECORD | | | | | GROWTH, HEALTH, AND IMMUNIZATION RECORD |

| Grade | Age | Name of Test | Score | T.A.* | Remarks | Date | Hgt. | Wgt. | Notes on Health, Diseases, and Vaccination |
|---|---|---|---|---|---|---|---|---|---|
| 4 | | Otis-Lennon M.A. Elem. II Form J | 2-77 | | I.Q. 84 | | | | |
| 4 | | Met. Math Elem. Form G | 3-77 | | G.E. 3.0 | | | | |
| 4 | | Gates-McGinitie Read. D-1 | 3-77 | | Voc. 2.0 -- Comp. 2.3 | | | | |
| 5 | | Gates-McGinitie Read. D-2 | 4-78 | | Voc. 3.1  comp 2.8 | | | | |

NORM SCORE  TYPE  DATE 3/79  GRADE 6  FM J  TEST OLMAT  BAT ELM 2  OTHER INFO.

| | | CA | AGE NMS | GR NMS | | | | |
|---|---|---|---|---|---|---|---|---|
| | | SCORE PR S | SCORE PR S | SCORE PR S | SCORE PR S | SCORE PR S | SCORE PR S | SCORE PR S |

CARO  CARL  YRS MO 12 14 01  IQ 80  RS 26  72  CA SUSPECT

NAME  CARO CARLOS

CAT C AND D  LEVEL/FORM 16C  GRADE 06.6  DATE 03/79

N = NO TEST AT LEVEL  A = NO VALID ATTEMPT

283B-001-001   81210

| | PHON ANL | STRUC AN | READING VOCAB | COMPR | TOTAL | SPELL | MECH | LANGUAGE EXPRES | TOTAL | COMPUT | MATHEMATICS CON/APP | TOTAL | TOTAL BATTERY | REF SKL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GE | N | N | 3.0 | 3.0 | 2.8 | 5.1 | 2.6 | 2.7 | 2.7 | 4.0 | 3.7 | 3.8 | 3.3 | 2.9 |
| NP | N | N | 4 | 5 | 3 | 34 | 6 | 8 | 5 | 6 | 8 | 6 | 4 | 5 |
| RS | N | N | 7 | 9 | 16 | 11 | 6 | 14 | 20 | 9 | 11 | 20 | 67 | 6 |
| QMS | N | N | 0/3 | 0/6 | | 0/3 | 0/5 | 0/7 | | 0/4 | 0/7 | | | 0/5 |

NAME  CARO CARLOS

CAT C AND D  LEVEL/FORM 17C  GRADE 07.7  DATE 04/80

N = NO TEST AT LEVEL  A = NO VALID ATTEMPT

1D33-002-001   81210

| | PHON ANL | STRUC AN | READING VOCAB | COMPR | TOTAL | SPELL | MECH | LANGUAGE EXPRES | TOTAL | COMPUT | MATHEMATICS CON/APP | TOTAL | TOTAL BATTERY | REF SKL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GE | N | N | 5.4 | 3.1 | 4.2 | 3.2 | 2.0 | 5.9 | 3.7 | 5.6 | 6.4 | 6.0 | 4.5 | A |
| NP | N | N | 21 | 4 | 9 | 6 | 1 | 33 | 12 | 18 | 33 | 26 | 11 | A |
| RS | N | N | 11 | 7 | 18 | 5 | 3 | 20 | 23 | 10 | 17 | 27 | 73 | A |
| QMS | N | N | 0/3 | 0/6 | | 0/3 | 0/5 | 0/7 | | 0/4 | 0/7 | | | A |
| | N | N | | | | | | | | | | | | A |
| | N | N | | | | | | | | | | | | A |

ships

CARO   CARLOS D   08
FALFURRIAS JUNIOR HIGH   02/81
OTIS LENNON MENTAL ABILITY TEST INT J
    MENTL
    ABLTY
  IQ    83
PA%   14%
PA9    3
PG%   13%
PG9    3

CARO  CARLO   08
FALFURRIAS JUNIOR HIGH   04/81
CALIFORNIA ACHIEVEMENT TEST C LEVEL 18

|  | N% | GE |  | N% | GE |
|---|---|---|---|---|---|
| READ VOCAB | 5% | 4.0 | READ COMP | 9% | 4.4 |
| TOTAL READ | 5% | 4.1 | SPELLING | 27% | 5.9 |
| LANG MECH | 8% | 3.4 | LANG EXPR | 3% | 2.5 |
| TOTAL LANG | 3% | 2.9 | MATH COMP | 11% | 5.7 |
| MATH C & A | 38% | 8.0 | TOTAL MATH | 23% | 6.9 |
| TOTAL BATT | 7% | 4.9 | REF SKILLS | 1% | 2.0 |

| Date | Final Recommendation and Comments |
|---|---|
| | |

*1. Deficient Vision   2. Deficient Hearing   3. Orthopedic Handicaps   4. Speech Disorders   5. Lowered Vitality   6. Nervous Disorders
7. Teeth   8. Lungs   9. Tonsils   10. Adenoids   11. Skin   12. Feet   13. Posture   14. Heart   15.      16.      17.      18.

(Position)

Signed by:

LAS® II
LANGUAGE ASSESSMENT SCALES©
Student Score Sheet
English — Level 2

Date of Test _9-13-78_

Name _CARO, CARLOS O._ Sex _M_ Date of Birth _2-9-67_ Age _11_

District_____ School _____ Teacher_____

Grade_ 6-1 _ Home Language _____ Ethnic Group_____

Examiner _David Benavides_ Test Language _____

## I. PAIRS

1. ___ them—them
2. ___ pet—pat
3. ✓ very—berry
4. ___ yellow—yellow
5. ___ hit—hit
6. ✓ hop—up
7. ✓ specially—especially
8. ___ back—back
9. ___ deep—dip
10. ___ rot—rat
11. ___ rang—rang
12. ___ thumb—thump
13. ___ thin—tin
14. ___ chain—chain
15. ___ rice—rise
16. ___ set—set
17. ___ mold—mold
18. ✓ fussy—fuzzy
19. ✓ shop—chop
20. ___ send—sent
21. ✓ whether—weather
22. ___ rain—ray
23. ___ sun—some
24. ___ cold—gold

## II. LEXICAL

25. ___ table
26. ___ train
27. ___ dog
28. ___ apple
29. ___ sofa (couch, etc.)
30. ___ bicycle
31. ___ elephant
32. ___ banana
33. ___ knife
34. ___ space ship (rocket)
35. ___ chicken
36. ___ bread
37. ___ hammer
38. ___ submarine
39. ___ dinosaur
40. ___ watermelon (melon)
41. ___ candle
42. ___ airplane
43. ___ camel
44. ___ cheese

## III. PHONEMES

45. ___ this
46. ✓ father/further
47. ___ very
48. ___ rivers/moving
49. ___ yoga
50. ___ yard/yellow
51. ___ hat
52. ___ ham/hot
53. ✓ luck
54. ___ hugged/bum
55. ___ bad
56. ___ sat/mat
57. ___ strum
58. ___ smiled/split
59. ___ thing
60. ✓ Kathy/thin
61. ___ chew
62. ✓ chocolates/cheap
63. ___ please
64. ___ bees/busy
65. ___ pet
66. ___ let/men
67. ___ toad
68. ___ food/good
69. ___ big
70. ✓ bit/mitt
71. ___ rib
72. ___ crab/tub
73. ___ bag
74. ___ girl/gone
75. ___ from
76. ___ room/warm
77. ___ popcorn
78. ___ peppers/pickled
79. ___ while
80. ___ white/wheat

## IV. COMPREHENSION

81. ___
82. ___
83. ___
84. ___
85. ___
86. ___
87. ✓
88. ✓
89. ___
90. ✓

## V. PRODUCTION
(scored on reverse side of this sheet)

## SCORING CALCULATIONS

| Prs. | | Lex. | | Phon. | | Comp. | | Prod. | | Sub-Total | | | Total | Level |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| .094 | + | .125 | + | .108 | + | .088 | + | .400 | = | 87 | × 100 = | | 87 | 4 |
| 1 | | 2 | | 3 | | 4 | | 5 | | 6 | | | 7 | 8 |

(handwritten totals above boxes: 18 Prs., 20 Lex., 3/1 Phon., 7 Comp., 4 Prod.)

Obs. 9   Wr. Prod. 10

Copyright© 1977, 1978 Linguametrics Group

Name _____    Date of Test _____

V    Production — Storytelling

Student Instructions: Now we're going to have a story. See these drawings? Well, these drawings tell a story and I'm going to play the story for you now. After the story is over I'd like you to tell me the story, as closely as you can remember it, exactly the way it was on the tape. So you'll have to listen very carefully. Let's see how much you can remember. Ready?
(After playing tape): Okay. Can you tell me the story exactly the way you heard it?

Teacher Instructions: Arrange Manual so 4 pictures can be seen simultaneously as student listens to tape. After hearing tape, ask student to retell story. BE SURE TO WRITE DOWN EVERY WORD OF STUDENT RESPONSE EXACTLY AS GIVEN. If student does not produce at least 50 words, try probe questions such as examples given below. Again, write down response exactly as spoken.

Probe questions to be used if necessary:

1. What was the town like where the kids lived?

2. Tell me about the kind of people who lived in the town.

3. What did the young people decide to do?

4. Tell me about the kid who played the flute.

5. How about the red-haired girl? What did she play?

6. Tell me about the lead singer.

7. How did the group earn its money?

8. What did they do with the money they earned?

*[handwritten student response, partially legible]: There was some boys that wanted to make a rock group so they could get out of town. There was a lot there that played the flute, a skinny girl that played the guitar, a man with white and black striped shirt sang, and a little man who played the drums. They sang such at ____. They played rock at weddings and then they made some money and they bought a ____. ____ and you could tell they were going ___*

**OBSERVATIONS**

Based on your observations, please give your assessment of this student's use of the English language. Rate the student's probability of success in the following situations.

(fail)    1 — 2 — 3 — 4 — 5 (Succeed fully)
(Circle One)

1. Asking for directions in English to an unfamiliar part of the school.        1 — 2 — 3 — 4 — 5

2. Telling a joke in English to monolingual peers.        1 — 2 — 3 — 4 — 5

3. Describing his/her family composition in English to a monolingual peer or teacher.        1 — 2 — 3 — 4 — 5

4. Explaining to a teacher in English why s/he had been absent from class.        1 — 2 — 3 — 4 — 5

5. Describing a science experiment in English.        1 — 2 — 3 — 4 — 5

total ÷ 5 = AV.

| CARO  CARLO | | 08 | FALFURRIAS JUNIOR HIGH |
|---|---|---|---|
| STUDENT NAME | STUDENT NUMBER | GRADE | SCHOOL NAME |

| CALIFORNIA ACHIEVEMENT TEST C LEVEL 18 | NATIONAL | 04/81 |
|---|---|---|
| TEST NAME | TYPE OF NORMS | DATE TESTED |

| TEST PART | PERCENTILES |
|---|---|
| READ VOCAB | 5 |
| READ COMP | 9 |
| TOTAL READ | 5 |
| SPELLING | 27 |
| LANG MECH | 8 |
| LANG EXPR | 3 |
| TOTAL LANG | 3 |
| MATH COMP | 11 |
| MATH C & A | 38 |
| TOTAL MATH | 23 |
| TOTAL BATT | 7 |
| REF SKILLS | 1 |

STANINES

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
|---|---|---|---|---|---|---|---|---|
| BELOW AVERAGE | | | AVERAGE | | | | ABOVE AVERAGE | |

**INDIVIDUAL TEST PROFILE**

Your scores on the test you recently took have been placed on this chart. The chart shows you how well you did on the test in comparison with other boys and girls in your grade throughout the country who have taken the same test.

The test has several parts. You have a score for each part and may have a total score for the test. Your chart shows you the areas in which you are the strongest and the areas in which you are the weakest. Your teacher will discuss these areas with you.

## ABOUT YOUR SCORES

Your percentile score shows what percent of the boys and girls in your grade across the country scored no higher than you scored. For example, if one of your percentile scores is 60, it shows that you scored better than 60 percent of the students in your grade throughout the country taking this test. In other words, you scored better than 60 out of every 100 pupils taking the test.

Your stanine score tells you your level of performance. If you have a 4th, 5th, or 6th stanine score, you are within the average range of scores for this test. Stanines 1, 2, and 3 indicate your level of performance was weak. Stanines 7, 8, and 9 indicate a stronger level of performance, or above average performance.

Your scores may be based on local norms. This means that your score will show how you performed within your own school district. For example, if your local percentile score is 60, it means you scored better than 60 percent of the boys and girls in your grade within your school district.

# FALFURRIAS HIGH SCHOOL RECORD

Name __CARO, CARLOS D.__   Parent or Guardian __Caro, Jose M., Jr.__

Address __X 607 N. Oleander   Falfurrias, Texas__   Birth Date __2/9/67__

Entered from what school __FALFURRIAS JR. HIGH__

Credits required for Graduation __20__

Grading System   A 90-100   B 80-89   C 70-79   D 60-69   F Below 60   7 Sem.   Grade Average _____   Class Rank _____

| School Year | Semester | Days Attended | Days Absent | Agriculture | Algebra | Art | Band | Bookkeeping | Biology | Business Law | Building Trades | Chemistry | Civics | Drafting | Drama | Driver Education | English | General Metals | Power Mechanics | Gen. Woodworking | Geography, World | Geometry | Physical Educ. | Health | History, Am. | History, World | Crafts | Home Economics | Home & Fam. Liv. | Journalism | Psychology | Physics | Fundamental Math | Science | Shorthand | Spanish | Speech | Trig./El. Analysis | Typing | V.O.E./D.E./C.V.A.E. | Introduction Algebra | Consumers Math | Farm Power | | Total Credits |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1981 | 1 | | 0 | . | | | | | | | | | | | | | F 79 | | | | | 79 31 | | | | | | | | | | | | F 60 40 | | | | | | | | | | | | 2 |
| 1982 | 2 | | W/D | 5/14/82 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DATE | 1 | | W/D | 12/29/82 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 2 | | W/D | 4/20/83 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DATE | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DATE | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DATE | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

| Yr. | Summer School | 1 | 2 | 3 | Yr. | Summer School | 1 | 2 | 3 | Transcript To: |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |

Graduated _____

Date                     Principal

# Exhibit 62




# Exhibit 62

## DECLARATION OF SUSAN RICHARDSON

I, Susan Richardson, declare under penalty of perjury the following:

1.  I am an investigator in the Federal Public Defender's Office in the Western District of Virginia and have been assigned to work on the case of *United States v. Caro*, Case No. 1:06-cr-0001-JPJ (W.D. Va.).

2.  As part of my investigation in that case, I looked into Mr. Caro's prior conviction from another case, *United States v.* Caro, Case No. 2:03-cr-10115-JPJ (W.D. Va.). I learned that attorney Louis Dene had represented Mr. Caro in that case and that Mr. Caro had entered a plea of guilty. I interviewed Mr. Dene on March 9, 2012. During this meeting, I first learned that Mr. Dene did not discourage Mr. Caro from entering the plea agreement. I also learned that Mr. Dene did not advise Mr. Caro about the consequences that his plea would have on the anticipated capital case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 20, 2013.

*Susan Richardson*
Susan Richardson

2-20-13
Date